**In re 222 LIBERTY ASSOCIATES, Debtor.**

**Bankruptcy No. 88–11535S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 4, 1990.

Stephen Raslavich, Philadelphia, Pa., for debtor.

Laurence J. Kaiser, Kronish, Lieb, Weiner & Hellman, New York City, for Donald L. Wolk.

Peter Meltzer, Drinker, Biddle & Reath, Philadelphia, Pa., for Goldome Realty Credit Corp.

Andrew N. Schwartz, Philadelphia, Pa., for creditors' committee.

Steven B. Mirow, Philadelphia, Pa., for Philip J. Banks.

Kenneth Carobus, Philadelphia, Pa., for Holt's Cigar Co.

James J. O'Connell, Ass't. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

We are called upon to confirm, if possible, one of two alternative plans of reorganization submitted by Donald L. Wolk (hereinafter referred to as "Wolk"), one of two general partners (the other being Philip J. Banks ("Banks")[1]) of Debtor 222 Liberty Associates, a New York Limited Partnership ("the Debtor"). The Plans under consideration are Wolk's Fifth Amended and Restated Plan of Reorganization ("the Fifth Plan"), filed on September 12, 1989, and Wolk's Sixth Amended and Restated Plan of Reorganization ("the Sixth Plan"), filed on October 24, 1989.[2] No hearings to test the confirmability of any of Wolk's first five plans were ever held because, in each case, it appeared that Wolk was unable to obtain financing to consummate the plans and he indicated a desire to replace each of the plans, in turn, with another.

Unfortunately, despite Wolk's herculean efforts at producing a confirmable plan, neither the Fifth Plan nor the Sixth Plan is confirmable, principally because, in each case, Wolk fails to adequately provide for the claim of, and protect the interests of, the Debtor's undersecured first mortgagee, Goldome Realty Credit Corp. ("Goldome"). The Fifth Plan cannot be confirmed be-

---

1. See page 997 n. 18 *infra* for a brief description of the litigation between Wolk and Banks, which pervaded the early stages of this case and still continues in other forums.

2. We note that the Fifth Plan is actually the fifth *amendment* to the original plan filed by Wolk on March 8, 1989, and, therefore, is the *sixth* plan filed by Wolk. Similarly, the Sixth Plan is actually the sixth *amendment* to the original plan filed by Wolk and, therefore, is the *seventh* plan filed by Wolk.

cause it fails to afford Goldome its right to credit bid, as required by 11 U.S.C. §§ 363(k), 1111(b) and 1129(b). The Sixth Plan cannot be confirmed principally because it unfairly discriminates against Goldome vis-a-vis other unsecured creditors with respect to payments to be made to it on its unsecured deficiency claim in violation of § 1129(b), and because it denies Goldome an effective § 1111(b) election. Certain other objections of Goldome to both plans, *e.g.*, misclassification of claims, lack of viability of the "new capital contribution exception" to the absolute priority rule, alleged infeasibility, and the failure of Wolk to supply personal financial statements, are deemed insufficient to prevent confirmation. However, we also express doubt as to whether Wolk's attempt to disregard the Debtor's partnership agreement (Banks' Objection) and to obtain a personal release from all creditors as a mere consequence of confirmation would not bar confirmation as well.

## B. PROCEDURAL AND FACTUAL HISTORY

A detailed summary of the history of the main underlying bankruptcy case of the Debtor is contained in two of our previous Opinions arising from this case, reported at 105 B.R. 798, 799–800 (Bankr.E.D.Pa.1989) (hereinafter *"Opinion II"*); and 99 B.R. 639, 641 (Bankr.E.D.Pa.1989) (hereinafter *"Opinion I"*). The reader is referred to these Opinions, and their content will not be reiterated here. Herein, we include only a brief summary of the facts necessary for an understanding of the issues now before us.

On May 3, 1988, an involuntary Chapter 11 petition was filed against the Debtor. The Order for relief was entered by consent on September 8, 1989. The Debtor is a limited partnership holding a single asset: an office building known as the American Patriot Building, located at 110 South 16th Street, Philadelphia, Pennsylvania ("the Property"). After a lengthy contested adversary trial, this court determined that the value of the Property is $4.5 million. *See Opinion II*, 105 B.R. at 799–800. It was estimated that the Property is in need of

approximately $4.5 million dollars of repairs to rehabilitate the Property and ready it for tenants. *Id.* at 800–01. The value of the Building, if satisfactorily renovated, was estimated to be in excess of $10 million dollars. *Id.* at 800. The Property is currently not only in disrepair, but it has extremely limited occupancy (less than twenty (20%) percent).

Wolk, as noted above, has proposed all of the plans presented in this case of the date of filing of the Sixth Plan, the first in this series having been filed on March 7, 1989. Wolk filed the First Amended and Restated Plan of Reorganization on April 4, 1989. The Second Amended Plan was filed on May 11, 1989; the Third Amended Plan on May 15, 1989; the Fourth Amended Plan on August 11, 1989; the Fifth Plan on September 12, 1989; and, finally, the Sixth Plan was filed on November 2, 1989.

The principal objector to all of the plans proposed by Wolk has been Goldome. Goldome granted a construction loan to the Debtor the balance of which, being approximately $6.5 million, clearly exceeds the value of the Property. Goldome's claim is secured by a Mortgage and Security Agreement dated June 15, 1985, given to Goldome by the Debtor (hereinafter "the Goldome Mortgage"). Wolk and Banks each executed personal guarantees of the Goldome Mortgage in favor of Goldome, dated June 25, 1985. In *Opinion II*, 105 B.R. at 605, deducting only $300,000 representing tax claims prior to Goldome's secured claim from the value of the Property, we determined that, pursuant to 11 U.S.C. § 506(a), the amount of Goldome's allowed secured claim against the Debtor is $4,200,000.

A confirmation hearing was held on December 6, 1989, relative to both the Fifth Plan and the Sixth Plan. The Unsecured Creditors' Committee supported both Plans, while Goldome and Banks raised Objections thereto. Wolk presented testimony regarding the feasibility of the plans. Goldome presented testimony in support of its objections. Banks presented the testimony of a prospective tenant of the Property but we were, and still are, unable to

discern its relevance to the matters before the court.[3]

As we indicated in *Opinion II*, 105 B.R. at 800, we had put off disposition of Goldome's motion to dismiss or convert this case to Chapter 7, pursuant to 11 U.S.C. § 1112(b) on several occasions to repeatedly allow Wolk "one more chance" to produce a confirmable plan. Thus, in our Order of September 7, 1989, we stated, in reference to the Fifth Plan, which we then believed would be the last attempt allowed to Wolk, that, if the Plan were not confirmed on October 25, 1989, Goldome's § 1112(b) motion would, "in all probability ... be granted as of course." However, in our Order of October 26, 1989, following a colloquy of October 25, 1989, in which we expressed our misgivings about the Fifth Plan, we allowed Wolk to file the Sixth Plan. In that Order, we again intoned that we anticipated granting Goldome's § 1112(b) motion "as of course" if neither Wolk's Fifth Plan nor his Sixth Plan could be confirmed after the hearing on same scheduled on December 6, 1989.

At the hearing on December 6, 1989, Goldome handed up to the court a copy of its own Plan of Reorganization ("the Goldome Plan"), filed on December 1, 1989, and filed an accompanying Disclosure Statement the following day. A hearing to consider Goldome's Disclosure Statement is scheduled on January 10, 1990. We note that Goldome's Plan happily proposes distributions funded by Goldome for the benefit of the Debtor's unsecured and administrative creditors, who might otherwise be left without payment upon denial of confirmation of the Fifth and Sixth Plans. See pages 996–998 *infra*. Goldome indicated a willingness to subordinate its § 1112(b) motion to its effort to confirm its proposed Plan. This willingness of Goldome to permit the Debtor's unsecured and administrative creditors to receive a recovery in this case renders our instant disposition to deny confirmation of Wolk's plans considerably less stark. Since the filing of Goldome's Plan was undoubtedly inspired by Wolk's

persistence in proposing his own plans, we can veritably conclude that this Plan is at least in part the fruit of Wolk's considerable efforts. We shall attempt to hold Goldome to the terms of its Plan in our Order, barring Wolk from proceeding with a new plan only so long as Goldome continues to pursue its plan.

## C. THE FIFTH PLAN CANNOT BE CONFIRMED BECAUSE WOLK REFUSED TO ALLOW GOLDOME TO CREDIT–BID AT THE SALE OF THE PROPERTY PROPOSED IN THAT PLAN.

█ Wolk's Fifth Plan, as well as his Sixth Plan, are lengthy and complex to the point of prolixity. We are therefore able to recite therefrom only such selected terms of these Plans which affect Goldome and the understanding of which are necessary for our discussion of the issues raised in connection with the confirmation of these Plans.

The Fifth Plan divides the Debtor's creditors into eight (8) classes with various subclasses. Goldome's claim is placed in Class 2, which also includes, in subclass 2A, the allowed unsecured claims of any governmental or municipal unit for charges against the Property. Goldome's claim makes up subclass 2B. Fifth Plan, ¶ 2.2, at 9–10.

The Fifth Plan proposes alternative treatments of Goldome's claim depending upon whether or not it accepts the Fifth Plan. If Goldome accepts the Fifth Plan, then it is deemed to have waived all rights it may have under 11 U.S.C. § 1111(b) of the Bankruptcy Code. Goldome's allowed secured claim would be fixed at $4.0 million, which it would receive in cash. Goldome also would receive $375,000 in cash and $1,125,000 in the form of an unsecured, non-negotiable, non-interest-bearing promissory note from the purchaser of the Property, Wolk or his designee, providing for ten (10) equal annual cash payments in the

---

**3.** However, this witness, Brett Shaffer, added an element of eclecticism to the hearing. He is an award-winning writer of popular songs who hopes to install a rock club in the second floor of the Property.

third through twelfth years of the note. In return for the items in the preceding sentence, Goldome is obliged to release Wolk from any liability under his guarantee relating to Goldome's transaction with the Debtor. The Fifth Plan also requires Goldome to indemnify Wolk on demand for any amounts Banks may recover from Wolk by way of contribution or indemnity relating to Goldome's transactions with the Debtor. Finally, Wolk would release Goldome from any further liability it may have to the Debtor and Wolk. *Id.*, ¶ 3.2(a), at 12–13.

Alternatively, if Goldome does not accept the Fifth Plan,[4] then it would receive only the allowed amount of its secured claim as determined pursuant to § 506. *Id.*, ¶ 3.2(b), at 13–14. Finally, regardless of whether Goldome votes in favor of the Fifth Plan, Goldome, at Wolk's election, must execute and deliver to Wolk (i) a satisfaction of the Goldome Mortgage; or (ii) an assignment of the Goldome Mortgage without recourse or representations and warranties. *Id.*, ¶ 3.2(c), at 14.

Wolk provides alternative methods for implementing the Fifth Plan. In exchange for Wolk's commitment to fund the Fifth Plan, the Plan requires the Debtor to sell to the New Owner, defined in the Plan to be Wolk or his designee: (1) all of its rights, title and interest in the Property; (2) all of its cash and personal property; (3) all of its claims against any third party who is not a claimant or interest holder in the bankruptcy case; and (4) the Debtor's recovery, if any, from claims against any claimant or interest holder. *Id.*, ¶ 5.1, at 21–22.

Alternatively, if Goldome accepts the Fifth Plan, at Wolk's option, the Property would remain titled to the Debtor, along with all cash, personal property, and claims against third parties belonging to the Debtor. *Id.*, ¶ 5.2, at 22. Notwithstanding anything to the contrary in the Debtor's Partnership Agreement, and without requiring

the consent of any other partner, Wolk would, per the Plan, have the sole right and authority to manage the Debtor. *Id.*, ¶ 6.1, at 23. Further, the Fifth Plan provides that confirmation of the Plan and receipt of the distribution due to a claimant under the Plan shall "constitute a release" of all claims which any claimant has against the Debtor, Wolk, and Banks. *Id.*, ¶ 9.2, at 27.

Finally, and the wellspring of Goldome's primary objection to the Plan, the Fifth Plan requires, as a condition precedent to confirmation, a final order from this court

> decreeing or adjudging, pursuant to sections 363(k) and 1111(b) of the Code, that the sale of the Property under this Plan is not subject to higher and better offers and that [Goldome] does not have the right or ability to bid the amount of its claim as a credit towards the purchase price in connection with a sale of the Property under this Plan or otherwise.

*Id.*, ¶ 8.2(d), at 25.[5]

As we alluded to in the preceding paragraph, Goldome's primary objection to the Fifth Plan is that it denies Goldome an effective § 1111(b) election because the Plan proposes a sale of the Property, which makes recourse treatment under § 1111(b)(1)(A) unavailable to Goldome, *and* it provides, as a condition precedent to confirmation, a prohibition of Goldome's credit-bidding. Goldome's position is that, if it is not permitted to make a § 1111(b)(2) election and it is precluded by the language of § 1111(b)(1) from converting its non-recourse claim into a recourse one, it has a right to credit bid at the sale of the Property and, by denying it this right, the Fifth Plan denies Goldome the benefits of § 1111(b).

Before discussing Goldome's objections to the Fifth Plan in detail, a review of the language and meaning of 11 U.S.C. § 1111(b), one of the most difficult sections of the Code, is necessary. That section provides, in full, as follows:

---

**4.** Goldome has not voted in favor of the Fifth Plan; therefore, had we confirmed the Fifth Plan, Goldome's claim would have been treated in the manner described hereinafter.

**5.** The process of a secured party bidding the amount of its claim as a credit against such claim at the sale of its collateral is commonly referred to as "credit-bidding."

(b)(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless—

(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

(B) A class of claims may not elect application of paragraph (2) of this subsection if—

(i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.

(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

Section 1111(b) must be read in conjunction with § 506(a) of the Bankruptcy Code, which applies to all bankruptcy cases filed under any Chapter. Section 506(a) provides that the claim of an undersecured creditor may be bifurcated, such that the undersecured creditor will have a secured claim to the extent of the value of the creditor's interest in the estate's interest in the property and an unsecured claim for the amount by which its total claim exceeds the § 506(a) valuation as of the date of confirmation. The court must determine the value of the undersecured creditor's collateral before determining the creditor's allowed secured claim pursuant to § 506(a). In *Opinion II, supra,* 105 B.R. at 805, in response to an adversary proceeding filed by Wolk for the specific purpose of obtaining a § 506(a) determination, we ultimately valued Goldome's secured claim at $4.2 million.

Section 1111(b) deals with the rights of partially-secured, or undersecured, creditors in Chapter 11 cases. Under § 1111(b)(1)(A), recourse and non-recourse claims secured by liens on property of the estate are treated as though they were recourse claims, with the claimant having an unsecured claim to the extent of its deficiency claim. Such claims are accorded this special recourse treatment unless an election is made under § 1111(b)(2), or, as in the case of Goldome, the claim is non-recourse and the property is sold under § 363 of the Code or is to be sold under the Plan. *See* § 1111(b)(1)(A)(ii).

If the § 1111(b)(2) election is made, an allowed claim is a secured claim to the extent that the claim is allowed, notwithstanding the value of the collateral as determined under § 506(a). *See generally In the Matter of Tampa Bay Associates, Ltd.,* 864 F.2d 47 (5th Cir.1989); *In re California Hancock, Inc.,* 88 B.R. 226 (Bankr. 9th Cir.1988); and *In re Western Real Estate Fund, Inc.,* 75 B.R. 580 (Bankr.W.D.Okla. 1987).

The purpose of the § 1111(b)(2) election, "is to provide additional protection" to an undersecured creditor where its collateral is worth more than the value given to it pursuant to § 506(a) or that the treatment of unsecured creditors under the proposed plan is "so unattractive that the electing creditor is willing to waive his unsecured deficiency claim." 5 COLLIER ON BANKRUPTCY, ¶ 1111.02[5], at 1111–27 (15th ed. 1989) (hereinafter cited as "COLLIER").

The drafters' Commentary is helpful in understanding § 1111(b) and, in pertinent part, provides as follows:

Section 1111(b)(1) [contains] the general rule that a secured claim is to be treated as a recourse claim in chapter 11 whether or not the claim is nonrecourse by agreement or applicable law. Such preferred status for a nonrecourse claim terminates if the property securing the

loan is sold under section 363 or is to be sold under the plan.

124 Cong.Rec.H 11,103–04 (Sept. 28, 1978).

Section 1111(b)(2) provides that an allowed claim is a secured claim to the full extent the claim is allowed rather [than] to the extent of the collateral as under section 506(a). A class may elect application of paragraph (2) only if the security is not of inconsequential value and, if the creditor is a recourse creditor, the collateral is not sold under section 363 or under the plan is excluded from treatment under section 1111(b) because of the secured party's right to bid in the full amount of his allowed claim at any sale of collateral under section 363(k) of the House amendment.

124 Cong.Rec.S 17,420 (Oct. 6, 1978).

The last sentence of the Commentary leads us directly into Goldome's primary objection to the Fifth Plan set forth at pages 976–977 *supra*. To repeat, by virtue of the sale of the Property proposed by the Fifth Plan, Goldome's status as a non-recourse creditor, and the provisions of § 1111(b)(1)(A)(ii) of the Code, Goldome's claim cannot be converted to a recourse claim under § 1111(b)(1). Further, because the Plan denies Goldome the right to credit-bid at the sale of the Property, the Fifth Plan effectively eliminates the benefits of § 1111(b) to Goldome.

We agree with Goldome, for the reasons set forth below, that the Code does not allow a plan proponent to thus deprive an undersecured non-recourse creditor, such as Goldome, of its right to the § 1111(b)(1) conversion or the § 1111(b)(2) election when the property is sold because the Code contemplates that the creditor is protected up to the full amount of its claim through its right to credit-bid at the sale of the property. The Fifth Plan denies Goldome the § 1111(b)(1) conversion to a recourse claim and also denies Goldome the § 1111(b)(2) election *and* its right to credit bid. Therefore, the Fifth Plan cannot be confirmed.

The Code does not specifically say that the undersecured creditor has the right to credit-bid in this situation.

It is, however, the clear intent of the draftsmen of the Code to protect the non-recourse secured creditor by permitting such creditor to have recourse against the debtor, *if the creditor is not permitted to bid in the amount of such creditor's debt in connection with a sale of the creditor's collateral.* For this reason, property encumbered by a lien in favor of a non-recourse secured creditor should not be sold at private sale or, if the property is not sold at auction, the secured creditor should be allowed to match any offer made by a prospective purchaser at private sale (emphasis added).

5 COLLIER, *supra,* ¶ 1111.02, at 1111–23 to 1111–24.

We reject Wolk's contention that Goldome's objection is no more than a view of "the intent or spirit of the Bankruptcy Code" or that Goldome's reliance on the legislative history of § 1111(b) is misplaced. Wolk believes that the language of § 1111(b), which does not make reference to the undersecured creditor's right to credit-bid, is clear and that it is not necessary to look to the legislative history in interpreting the statute.

In support of his position that this court should not consult the legislative history of § 1111(b) when interpreting that section, Wolk cites to *United States v. Ron Pair Enterprises, Inc.,* —— U.S. ——, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989), in which the Supreme Court found that the "natural reading" of § 506(b) of the Code expressed "Congress' intent ... with sufficient precision so that reference to legislative history ... is hardly necessary." By way of contrast, we decline to find that the language of § 1111(b) is so plain on its face that Congress' intent can be clearly understood without reference to the legislative history. The fact that commentators such as Collier and other courts interpreting § 1111(b) all refer to the legislative history when construing the section, supports our belief that the language, or the "natural reading," of the section is not so clear that reference to the legislative history is not necessary. *See In re Realty Investments, Ltd. V,* 72

B.R. 143, 145 (Bankr.C.D.Cal.1987) (the court "struggled with the language of § 1111(b)(1)(B)(ii) ...''); and *In re Woodridge North Apts., Ltd.,* 71 B.R. 189, 191 (Bankr.N.D.Cal.1987) (discussing § 1111(b), the court states that "[t]he language of the Bankruptcy Code does not provide a clear answer.")

Finally, if we adopt Wolk's position and hold that Goldome is not permitted to credit-bid nor permitted to be treated as a recourse creditor, then the Fifth Plan will cash out Goldome's claim at the court-determined fair market value of the Property rather than the amount to which the Debtor agreed to pay in the original contract and mortgage and Goldome will be unable to protect itself by bidding what it believes is the value of the Property at the planned sale. This is precisely what happened in *In re Pine Gate Associates, Ltd.,*[6] 3 B.C.D. 301 (N.D.Ga.1977), and is what Congress sought to avoid by the enactment of §§ 1111(b) and 1129(b).

Case law holds that an undersecured lender, if unable to have its non-recourse claim converted to one with recourse under § 1111(b)(1)(A), such as Goldome, must be permitted to credit-bid at the sale of its collateral. In *California Hancock, supra,* the United States Bankruptcy Appellate Panel of the Ninth Circuit (hereinafter "BAP"), refused to confirm a corporate debtor's plan which proposed to sell the debtor's only asset, an apartment complex, because the terms of the plan did not allow the mortgagee its right to credit-bid. 88 B.R. at 228. In reaching this conclusion, the BAP had to consider the relationship between § 1111(b) and § 363(k). *Id.* at 229. Section 363(k) permits a lienholder to bid up to the entire amount of its lien when property is sold out of the ordinary course of business and provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless

the court for cause orders otherwise the holder of such claim may bid at such sale, and if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

Section 363(b), referred to in § 363(k), provides for the sale of property of the estate out of the ordinary course of business after notice and a hearing.

While the language of § 363(k) does not expressly provide that the creditor has the right to credit-bid when the property is being sold pursuant to a plan of reorganization, several courts, and, in particular, the bankruptcy court in *Realty Investments, supra,* 72 B.R. at 146, have determined that the following legislative history supports the conclusion that the creditor has the right to credit-bid when the property is being sold pursuant to a plan of reorganization:

> Sale of property under section 363 or under the plan is excluded from treatment under section 1111(b) because of the secured party's right to bid in the full amount of his allowed claim at any sale of collateral under section 363(k) ...

*California Hancock,* 88 B.R. at 230, *quoting Realty Investments,* 72 B.R. at 146.

In *Realty Investments,* the debtor was a limited partnership formed for the purpose of owning and operating a piece of commercial real property. *Id.* at 144. The debtor's plan proposed to sell the property and pay the undersecured lender the allowed amount of its secured claim, which the debtor argued was zero. *Id.* at 145. Referring to the Congressional language quoted above, the court concluded that "the Bankruptcy Code reflects the intent of Congress to give a non-recourse secured creditor the right to credit-bid on the property and take the property in lieu of its claim." *Id.* at 146.

In *Woodridge North, supra,* 71 B.R. at 191, the bankruptcy court adopted the lan-

---

6. *Pine Gate* involved a limited partnership which owned a single real property asset encumbered by a lien in favor of a single lender. The court limited the lender's claim to the appraised value of the property, which was significantly less than the amount of the debt in the original contract. The *Pine Gate* decision has

been criticized on a number of grounds, including that it imposes the entire risk of under-valuation by the bankruptcy court on the secured creditor and permits the debtor to receive all of the benefits of future appreciation of the property. *See Woodridge North,* 71 B.R. at 191–192, and authorities cited therein.

guage from Collier set forth at page 978 *supra* and concluded that "the sale exception of section 1111(b)(1)(A) applies only where the lienholder is allowed to credit-bid." In reaching this conclusion, the court stated that the "purpose of section 1111(b) also requires that a lienholder be permitted to credit bid," *id.,* and

> the purpose of section 1111(b)(1)(A) is not satisfied by a sale at which the lienholder may not credit bid. In such circumstances, the lienholder still bears the risk of undervaluation, because it cannot insist that it receive the property instead of the value determined by the Bankruptcy Court.

*Id.* at 192. *Accord Tampa Bay Associates, supra,* 864 F.2d at 502; *In re Waterways Barge Partnership,* 104 B.R. 776, 781–82 (Bankr.N.D.Miss.1989); and *In re South Village,* 25 B.R. 987, 999 (Bankr.D. Utah 1982).

Wolk offers nothing more than contrived outrage that the above-cited cases fail to confront, in his opinion, the plain language of § 1111(b) and, that they rely upon statements of Congressional intent set forth in the legislative history. Neither those courts nor this one prefer legislative history over the words of the statute, but, where, as here, the words of the statute are not sufficiently clear so that the statute can be readily interpreted, reference to legislative history is critical.

In light of the language of § 1111(b), the Congressional intent as set forth in the legislative history, commentaries, and case law, we conclude that the Fifth Plan cannot be confirmed because it denies Goldome the option to be treated as recourse under § 1111(b)(1) *and* its right to credit bid at the sale of the Property.

## D. THE SIXTH PLAN CANNOT BE CONFIRMED, PRINCIPALLY BECAUSE IT DISCRIMINATES UNFAIRLY AGAINST GOLDOME AND FAILS TO GIVE GOLDOME AN APPROPRIATE § 1111(b) ELECTION.

### 1. *A Description of the Sixth Plan.*

It became apparent during a colloquy with interested counsel on October 24, 1989, the established date of the confirmation hearing on Wolk's Fifth Plan, that the court was inclined to rule in Goldome's favor as to the objection discussed at pages 976–980 *supra,* which was the only issue briefed by the parties at length in reference to that Plan. Without withdrawing the Fifth Plan, Wolk expressed a facility to promptly prepare another plan which would ameliorate this objection and we allowed him to do so.

It was apparent to the parties that the December 6, 1989, hearing on confirmation of the Sixth Plan, and technically on confirmation of the Fifth Plan as well, would constitute the grand finale of Wolk's efforts to produce a confirmable Plan. We requested Briefs from all interested parties on December 1, 1989, prior to the December 6, 1989, hearing, and both Wolk and Goldome submitted unsolicited Reply Briefs to the submission of the other. *But see In re Jungkurth,* 74 B.R. 323, 325–26 (Bankr.E.D.Pa.1987), *aff'd,* 87 B.R. 333 (E.D.Pa.1988) (unsolicited submissions are disfavored). Banks also briefed his Objections to the Sixth Plan. As a result, the parties, in addressing the Sixth Plan, more-so than in addressing the Fifth Plan, raised a wide variety of issues, most of which deserve treatment. Therefore, our discussion of the Sixth Plan is more extensive and is broken down into sub-hearings discussing most of the issues raised by the parties.

As in our discussion of the Fifth Plan, it is not necessary for us to set forth all of the terms of the Sixth Plan. Moreover, as we recognized in allowing Wolk to dispatch a Disclosure Statement which only emphasized the differences between the Fifth Plan and the Sixth Plan, the two Plans are very similar. We shall emphasize herein only those elements of the Sixth Plan which differ from the provisions of the Fifth Plan, described at pages 975–76 *supra.* Unlike the Fifth Plan, the Sixth Plan does not contemplate a sale of the Property or other assets of the Debtor and hence, unlike that Plan, the Sixth Plan provides

Goldome with the opportunity to make the 11 U.S.C. § 1111(b) election. Thus, Class 4 of the Sixth Plan consists of allowed unsecured claims including, as Class 4B, "the Allowed Unsecured Claim held by Goldome if Goldome does not timely elect application of § 1111(b)(2) of the Code." Sixth Plan, ¶ 2.4, at 11.

The Sixth Plan proposes alternative treatment of Goldome's secured and unsecured claims depending upon whether or not Goldome (1) makes the § 1111(b)(2) election; and (2) accepts the Sixth Plan. If Goldome, as a Class 2B (secured) claimant, does not make the § 1111(b)(2) election and accepts the Sixth Plan, then Goldome's allowed secured claim will be fixed at $4.2 million and paid in cash to Goldome on the "Initial Distribution Date" as that term is defined by the plan. Goldome will also receive $175,000 in cash on the Initial Distribution Date and $1,325,000 in the form of an unsecured, non-negotiable, non-interest bearing, assumable promissory note from Wolk providing for ten (10) equal annual cash payments to be paid on the third through twelfth years of the note. In exchange for the items in the preceding sentence, Goldome must release Wolk from his guarantee relating to Goldome's transactions with the Debtor. Goldome also must agree to indemnity Wolk for any amounts recovered by Banks from Wolk by way of contribution or indemnity relating to Goldome's claims. Finally, Wolk will release Goldome from any remaining liability it may have relating to the Debtor. *Id.*, ¶ 3.2(a), at 13–14.

If Goldome does not make the § 1111(b)(2) election, and rejects the Sixth Plan, then it will receive the amount of its allowed secured claim, $4.2 million, in cash, on the Initial Distribution Date, and its unsecured deficiency claim will be included in Class 4B. *Id.*, ¶ 3.2(b), at 15.

If Goldome makes the § 1111(b)(2) election, then, regardless of whether it accepts the Sixth Plan, Goldome will receive its allowed claim in the form of an Election Note from the Debtor secured by an Election Mortgage. The principal amount of the Election Note, $4.2 million, is due and payable on the tenth anniversary of the note. Interest, calculated at a rate of eleven (11%) percent, is due and payable monthly unless the Debtor elects, with no notice to Goldome, to defer such interest for eighteen (18) months. None of the Debtor's partners will have any personal liability to Goldome for any amounts due under the Election Note. Pursuant to the Election Mortgage, Goldome will retain its first lien on the Property.

If Goldome makes the § 1111(b)(2) election and accepts the Sixth Plan, then, as before, Goldome must release Wolk from his guarantee relating to Goldome's transactions with the Debtor, the Debtor and Wolk will release Goldome from any liability relating to the Debtor, and Goldome must indemnity Wolk for any amounts recovered by Banks from Wolk by way of contribution or indemnity relating to Goldome. *Id.*, ¶ 3.2(c), at 15.

If Goldome does not make the § 1111(b)(2) election, regardless of whether it accepts the Sixth Plan, Goldome must execute and deliver to Wolk, at Wolk's option, (i) a satisfaction of the Goldome Mortgage; or (ii) an assignment of the Goldome Mortgage to Wolk or his designee without recourse or representations. *Id.*, ¶ 3.2(d), at 16. Except as provided in ¶ 3.2(a) of the Sixth Plan, as set forth in page 981 *supra*, nothing in ¶ 3.2(d) will release Wolk or Banks from any liability they may have as guarantors of the Goldome Mortgage.

The Sixth Plan then provides that the Debtor pay all Class 4 claimants (Class 4A consists of all allowed unsecured claims except those in Class 1,[7] Class 3,[8] Class 4B and Class 5 [9]) two (2%) percent of their

---

7. Class 1 of the Sixth Plan consists of all allowed claims entitled to priority under §§ 503(b) and 507(a) of the Code.

8. Class 3 of the Sixth Plan consists of all allowed claims of undersecured creditors.

9. Class 5 of the Sixth Plan consists of allowed claims on account of loans made to the Debtor pursuant to § 3.6 of the Debtor's Partnership Agreement and allowed claims of Wolk and Banks for (a) pre-petition advances or loans to or for the benefit of the Debtor; or (b) compen-

allowed claims without interest. *Id.*, ¶ 3.4, at 17. However, in addition to the two (2%) percent payment by the Debtor to Classes 4A and 4B proposed in ¶ 3.4 of the Sixth Plan, Wolk or his designee, on account of Wolk's potential liability to Class 3A, 3B and 4A claimants, intends to pay Classes 3A, 3B and 4A an additional thirty-eight (38%) percent of their allowed claims in cash on the Initial Distribution Date and an additional sixty (60%) percent of their allowed claims as *pro rata* beneficiaries of a non-interest bearing, non-negotiable, assumable promissory note from Wolk personally providing for ten (10) equal annual payments to be made in the third through twelfth years of the note. *Id.*, Art. 5, at 22–23.

At Wolk's election, three alternate methods of implementing the Sixth Plan are available. These methods are set forth in the Sixth Plan in Article VI, at 23–27. We refer, however, to the Debtor's discussion of these methods in its Supplemental Disclosure Statement to the Sixth Amended and Restated Plan of Reorganization because of the more concise manner in which they are presented therein. The Supplemental Disclosure Statement states that there is no "difference, prejudice or harm" to the creditors from Wolk's election of one method of implementation over another. Under the first two alternatives, the Debtor will retain the Property; under the third alternative, the Property will be "contributed" to a new Wolk-controlled entity in exchange for an equity interest in that entity.

Under the first [10] alternative, the Debtor will retain the Property as "Reorganized 222 Liberty Associates" (hereinafter referred to as "Reorganized 222") with all of the equity interests in Reorganized 222 being distributed to Class 3C. Class 3C consists of the holder of the Meridian Mortgage, who is Wolk's son-in-law, David Maddenbaum, Esquire.[11] Then, Wolk and his son-in-law will cause the funds necessary to make the distributions contemplated by the Sixth Plan to be transferred to the Debtor.

Under the second alternative, the Debtor will retain the Property as Reorganized 222 with all of the equity interests in Reorganized 222 being distributed to W.W.P. Partnership (hereinafter referred to as "WWP"), a Wolk-controlled limited partner of the Debtor and a Class 7 claimant under the Sixth Plan, in exchange for an equity contribution to the Debtor to fund the Sixth Plan.

Finally, under the third alternative, the Property will be contributed to a new limited partnership (hereinafter referred to as the "New Owner") in exchange for a limited partnership interest in the New Owner. The equity interests of the Debtor in the New Owner will be held for the benefit of Classes 3A, 3B, 4A and 4B. The Debtor's equity interest in the New Owner will not have voting rights, but the Debtor will receive ten (10%) percent of additional distributions which are made to the New Owner's partners after priority distributions are made to other partners. No testimony or evidence was offered to establish what the value of such additional distributions might be and, at this point, we will not even venture a guess of their value, if any. Under the third alternative, the New Owner has the option to redeem the Debtor's interest at any time "for redemption price equal to the greater of $1,000.00 or an amount equal to the distributions which the Debtor would receive upon liquidation of the New Owner ... assuming that the assets of the New Owner ... were sold for a net amount equal to ninety (90%) percent of the appraised value of the Property as of a date within forty-five (45) days of the redemption date." Again, this court will not even venture a guess as to what the redemption price of the Debtor's interest in

---

sation or other reimbursement due from the Debtor pursuant to the Partnership Agreement.

**10.** The alternatives are presented in the order of Wolk's preference. Wolk testified at the hearing before this court on December 6, 1989, that he would prefer alternative number 1 followed by number 2 and then number 3.

**11.** Wolk was the holder of the Meridian Mortgage until shortly before the December 6, 1989, hearing at which time he transferred it to his son-in-law.

the New Owner will be except that it will be at least $1,000.00. Wolk states in the Disclosure Statement that the creditors will receive the greatest distribution under the third alternative.

As in the Fifth Plan, the Sixth Plan requires, as a condition precedent to the consummation of the Sixth Plan, waivable by Wolk, that this court shall enter an order

decreeing or adjudging, pursuant to section 363(k) and 1111(b) of the Code, that the transfer, if any, of the Property under this Plan is not subject to higher and better offers and that [Goldome] does not have the right or ability to bid the amount of its claim as a credit toward the purchase price in connection with the transfer of the Property under this Plan or otherwise.

However, Wolk has avoided the problems encountered when he denied Goldome its right to credit bid in the Fifth Plan by not proposing to sell the Property under the Sixth Plan. Absent such a sale, the benefits of § 1111(b)(1)(A) are available to Goldome whose claim will now be treated as recourse.

2. *The Sixth Plan Does Not Violate the Absolute Priority Rule Because of the Applicability of the "New Capital Contribution Exception."*

■ Section 1129(b)(2)(B)(ii) of the Code, in setting the parameters of when a plan is fair and equitable, states that, with respect to unsecured claims, the holder of any claim or interest junior to such claim must not receive or retain any property on account of such junior claim or interest under the plan. In other words, a junior creditor may not receive any distributions under the plan until all senior creditors have been paid in full. This is known, generally, as the "absolute priority rule." Goldome argues that the Sixth Plan violates the absolute priority rule because, while it provides that Goldome does not receive the present value of its unsecured claim, Wolk, or a Wolk-related entity or individual, will retain an interest in the Debtor and, in exchange

for a capital contribution, may become the sole partner and owner of the Debtor.

We conclude that the Sixth Plan does not violate the absolute priority rule because of the applicability of the "new capital contribution exception" to the absolute priority rule. The new capital contribution exception was first enunciated by the United States Supreme Court in *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 122, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939). In *Case,* the court indicated that it would approve stockholder participation in a plan of reorganization only

where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, [and thus] no objection can be made.

*Id.* at 121, 60 S.Ct. at 10. The "necessity" referred to by the court in the quoted passage above is the necessity for a debtor to seek new money "essential to the success of the undertaking" from the old stockholders. *Id.* In other words, the Supreme Court held that a junior claimant may retain an interest in the debtor even though senior claimants have not been paid in full if the junior claimant makes a cash infusion which is both necessary and substantial to the debtor. *Id.*[12]

■ It is Goldome's position that the new capital contribution exception no longer exists under the Bankruptcy Code. In support of its position, Goldome relies upon *In re Winters,* 99 B.R. 658, 663 (Bankr.W. D.Pa.1989), which specifically held that § 1129(b) does not permit the new capital contribution exception. Several courts have criticized the exception, but no other court has yet to follow *Winters'* aggressive approach. In fact, the Supreme Court, in *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 203–05 n. 3, 108 S.Ct. 963, 967 n. 3, 99 L.Ed.2d 169 (1988), refused to discredit the viability of the new capital contribution exception, specifically stating that "our decision today should not be taken as any comment on the continuing vitality of the exception. . . ." We understand

---

**12.** The cash infusion in *Case* failed the new capital contribution exception because it was not substantial. 308 U.S. at 121–22, 60 S.Ct. at 10.

the Court to be saying here that it had not taken any action to eliminate the new capital contribution exception.

Perhaps influencing the court in *Winters, supra*, were the aggravated facts before it. Presented was a Chapter 11 plan that proposed to pay unsecured creditors having claims totalling $77,000.00 only fifteen (15%) percent of their claims while the debtor retained its ownership interest in exchange for a modest contribution of $4,000. The court determined that there is no new capital contribution exception and, therefore, the plan could not be confirmed because the absolute priority rule was violated. The court reasoned that, in drafting the 1978 Bankruptcy Code, "Congress, with apparent deliberation, did not mention the 'infusion of new capital' as a consideration in applying the [§ 1129(b)] fair and equitable test." 99 B.R. at 663. *But see H.G. Burks, Satisfying the Absolute Priority Rule with Postpetition, Preconfirmation Labor*, NORTON BANKR. L. ADVISOR, Dec., 1989.—No. 12, at 1 (assumes that exception exists and suggests a method by which "sweat equity" could be the contribution even after *Ahlers*); and D. Grimes, *Is New Capital Contribution Exception Still a Viable Rule?*, BANKR. STRATEGIST, Vol. VIII, No. 12 at 4, 7 (Nov.1989) (points out that elimination of the exception may induce conversions to chapter 7 and decrease payments to unsecured creditors).

Few courts, as well as the foregoing commentators, have urged following the elimination of the new capital contribution exception in the fashion of *Winters. See, e.g., Group of Institutional Investors v. Chicago, M. St.P. & P. R.R.*, 318 U.S. 523, 570, 63 S.Ct. 727, 751, 87 L.Ed. 959 (1943); *In re U.S. Truck Co.*, 800 F.2d 581, 588 (6th Cir.1986); *In re Greystone III Joint Venture*, 102 B.R. 560, 572–81 (Bankr.W. D.Tex.1989); *In re Yasparro*, 100 B.R. 91, 94–99 (Bankr.M.D.Fla.1989); *In re Henke*, 90 B.R. 451, 455 (Bankr.Mont.1988); *In re Future Energy Corp.*, 83 B.R. 470, 499 (Bankr.S.D.Ohio 1988); *In re AG Consultants Grain Division Inc.*, 77 B.R. 665 (Bankr.N.D.Ind.1987); and *In re Eisen-*

*barth*, 77 B.R. 228, 236 (Bankr.D.N.D. 1987).

■ The new capital contribution exception serves the narrow purpose of affording the debtor the capital necessary to survive. *Greystone, supra*, 102 B.R. at 575. Courts have offered various tests for applying the exception. For example, the Supreme Court, in *Group of Institutional Investors*, 318 U.S. at 570, 63 S.Ct. at 751, held that requiring a strong showing of both necessity and substantiality will assure that a debtor's equity holders will not eviscerate the absolute priority rule by means of gratuitous, token cash infusions proposed primarily to buy cheap financing. In *Greystone*, 102 B.R. at 576, the court held that the exception applies

> If (and only if) the cash infusion *is* needed, it must be actual money or money's worth, paid not merely promised, and the participation accorded the equity interests in exchange for this cash infusion must be commensurate, reasonably equivalent.

The bankruptcy court in *Yasparro*, 100 B.R. at 99, concluded that the following factors must be considered when determining the applicability of the new capital contribution exception:

1. Is the contribution money or other tangible property?
2. Is the tangible property freely tradeable in the economy?
3. Is the capital investment a present contribution rather than a contribution to take place in the future?
4. Is the capital investment a new contribution to the reorganized debtor?
5. Is the contributor bearing an economic risk by making the contribution?

It appears to us that the test enunciated by *Greystone*, if satisfied, will fulfill the requirements of "necessity" and "substantiality" articulated by the Supreme Court in *Case, supra*. The *Yasparro* test, especially factors 2 and 5, requires additional showings not contemplated by *Case*. We, therefore, will consider Wolk's contribution under the Sixth Plan under the *Greystone* test.

Wolk, individually and/or as a partner of W.W.P. Partnership, will be contributing approximately $1.92 million dollars to the Debtor to fund the contributions contemplated by the Sixth Plan. In return for this contribution, Wolk or a Wolk-related individual or entity will receive the equity interests of the Debtor and assume sole management of the Debtor.

Wolk testified at the December 6, 1989, hearing that his cash contribution is necessary to fund the plan. No evidence or testimony was presented to rebut this statement, and it seems to be quite obviously true. Therefore, we conclude that the cash contribution is indeed necessary. The contribution is to be paid in cash upon the consummation of the Sixth Plan.

Finally, we must determine if the interests obtained by Wolk, or W.W.P. Partnership, are "reasonably equivalent" to the capital contribution. The Debtor has no equity in the Property. Wolk, or W.W.P. Partnership, will be assuming a large risk in funding the Debtor's reorganization. Significant work, costing approximately $4.5 million, must be completed before the Property will be in a condition to generate any type of return on Wolk's contribution. In light of these considerations, we conclude that the interests obtained by Wolk, or W.W.P. Partnership, are reasonably equivalent to the contribution made.

We therefore conclude that the new capital contribution exception is a viable exception to the absolute priority rule, and we decline to follow the broad holding of *Winters, supra*, that this exception has been eviscerated by the Code or *Ahlers*. We further conclude that the cash contribution contemplated by Wolk under the Sixth Plan falls within the parameters of the new capital contribution exception as set forth in the *Greystone* test, which we deem appropriate. Therefore, we conclude that the Sixth Plan is not violative of the absolute priority rule.

3. *Goldome's Unsecured Claim May Not Be Increased to Reflect $300,000 in Credit for Real Estate Taxes Paid by It.*

In determining the amount of Goldome's allowed secured claim pursuant to § 506(a),

we deducted from Goldome's claim prior tax liens against the Property. *See Opinion II*, 105 B.R. at 801 and the cases cited therein. Goldome now claims that to the extent that we reduced the value of its secured claim by $300,000 to reflect unpaid real estate taxes, it must be provided with a recourse unsecured claim in that amount against the Debtor in the Sixth Plan.

Since Goldome has presented no evidence that it has paid these real estate taxes (to the best of our knowledge, these taxes remain unpaid), we refuse to find that the Sixth Plan, or any plan for that matter, must provide Goldome with a claim for the amount of these taxes.

4. *The Sixth Plan Is Feasible.*

Section 1129(a)(11) requires as a condition of confirmation that the court find that

[c]onfirmation of the plan is not likely to be followed by liquidation, or the need for future financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

In other words, the plan must be feasible.

As Collier has noted:

Basically, feasibility involves the question of emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success. It is not necessary that success be guaranteed, but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success.

5 COLLIER, *supra*, ¶ 1129.02[11], at 1129–36.11. *Accord, In re Orlando Investors, L.P.*, 103 B.R. 593, 600 (Bankr.E.D.Pa.1989) (FOX, J.) ("Feasibility does not require that substantial consummation of the plan be guaranteed; rather, the plan proponent must demonstrate that there be a reasonable assurance of compliance with plan terms"). *See also In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir.1985); *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th

Cir.1985); *In re Gulph Woods Corp.*, 84 B.R. 961, 973–74 (Bankr.E.D.Pa.1988), *aff'd,* C.A. No. 88–4081 (E.D.Pa. Feb. 24, 1989); *In re Johns–Manville Corp.*, 68 B.R. 618, 635 (Bankr.S.D.N.Y.1987), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988); *In re Belco Vending, Inc.*, 67 B.R. 234, 236–37 (Bankr.D.Mass. 1986); and *In re Haardt*, 65 B.R. 697, 701–02 (Bankr.E.D.Pa.1986). The basic purpose of § 1129(a)(11) is to avoid confirmation of "visionary schemes which promise creditors ... more under a proposed plan than the debtor can possibly attain after confirmation." COLLIER, *supra,* ¶ 1129.02[11], at 1129–36.11.

■ Case law has established that there are many factors to consider in making a feasibility determination. These factors include: (1) the adequacy of the debtor's capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.D.N.J.1980). *Accord, U.S. Truck, supra,* 800 F.2d at 589; *Gulph Woods, supra,* 84 B.R. at 973; *In re Adamson, Inc.*, 42 B.R. 169, 174 (Bankr.E. D.Va.1984); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151 (Bankr.S.D.N. Y.1984); and *In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr.D.Mass. 1983). Other factors may be important. As one court notes, the time within which payouts are made is also a consideration: "The longer the debtor proposes a payout, the more difficult it may become to prove distant future ability to service accounts." *In re White*, 36 B.R. 199, 203–04 (Bankr.D. Kan.1983). As stated by our colleague, Judge Fox, "at bottom, ... one must focus upon the specific terms of the plan in order to determine its plausibility." *Orlando Investors, supra,* 103 B.R. at 600.

Goldome claims that the Sixth Plan is not feasible because (1) Wolk has not obtained the required financing; and (2) Wolk can-

not obtain financing sufficient to pay Goldome its total claim including its additional $300,000 claim on account of the real estate taxes. We can readily disregard the second half of Goldome's argument, as we have already determined that Goldome is not entitled to an additional claim of $300,-000 on account of the real estate taxes absent evidence that it has paid such an amount.

At the hearing on December 6, 1989, Wolk's counsel introduced into evidence a financing commitment letter from Meridian Bank (the "Commitment Letter"). Testimony regarding the Commitment Letter was a bit disorganized, as Wolk's counsel had inexplicably failed to provide copies of the Commitment Letter to other counsel even though they had spent approximately four hours together waiting for the hearing to begin. Nevertheless, the Commitment Letter was admitted into evidence and testimony regarding the Commitment Letter was obtained from Wolk and Patricia Debo, an Assistant Vice–President and a Commercial Loan Officer of Meridian Bank.

Briefly, the Commitment Letter provides that Meridian Bank promises to lend $8,650,000 to refinance and renovate the Property to a limited partnership whose general partners will be Wolk and his brother, Beryl Wolk. Meridian Bank's loan will be secured by a first mortgage on the Property and a perfected security interest in all personal property, fixtures, furniture, etc., located therein and various other liens and assignments. Wolk and his brother will also be required to execute personal guarantees in favor of Meridian Bank for the amounts due under the loan. The Commitment Letter lists seventeen (17) conditions to which the commitment is subject, including the posting of a $4 million standby letter of credit and the receipt of an appraisal indicating a minimum market value of the Property upon completion of rehabilitation of $10,350,000.

Ms. Debo testified that Meridian Bank feels quite comfortable in assuming that Wolk can satisfy all of the seventeen (17) conditions contained in the Commitment Letter by the February 15, 1990, deadline

set forth therein. Ms. Debo further indicated that, if the conditions could not be satisfied by February 15, 1990, Meridian Bank probably would extend the deadline.

Wolk admitted under cross-examination by Goldome's counsel that the $4 million dollar standby letter of credit required by the Commitment Letter is not in place, but further stated that he has an investor who is prepared to put the letter of credit in place upon confirmation of the Sixth Plan. While being ready to put the letter of credit in place and having one in place are two different things, Meridian Bank, the entity ultimately at risk for the funds, is satisfied with this letter of credit arrangement and has issued the Commitment Letter on these terms. Even though we are slightly uncomfortable with Wolk's ability to comply with this particular condition to the Commitment Letter, if Meridian Bank is satisfied and prepared to go forward under these circumstances, we believe the funding is sufficiently secure.

We also have some degree of discomfort regarding Wolk's ability to satisfy certain other conditions of the Commitment Letter, including providing a post-renovation fair market appraisal of $10,350,000 and cleaning up all hazardous materials on the Property by February 15, 1990. We find ourselves, however, deferring to the experience and expertise of the lender. If Meridian Bank were not satisfied that Wolk could comply with the conditions in the Commitment Letter, it would not have committed to lend such a large sum of money to this undertaking.

As we stated earlier, feasibility does not require that substantial consummation of the plan be guaranteed; rather, the proponent must demonstrate that there be a reasonable assurance of compliance with plan terms. *Orlando Investors, supra,* 103 B.R. at 600. Relying upon Wolk's testimony regarding his efforts to comply with the terms of the Commitment Letter and Ms. Debo's testimony on behalf of Meridian Bank that it is satisfied that the conditions can be met, we conclude that Wolk has provided a reasonable assurance that he can implement and comply with the

terms of the Sixth Plan. The Plan is, therefore, feasible as to Wolk's ability to obtain financing.

We note, however, that the Sixth Plan includes many other conditions precedent to consummation, *e.g.,* acceptance by Nassau County, New York, of certain undisclosed amendments to the Partnership Agreement and several Orders from this court on varying topics. While we are not stating that Nassau County would not accept the amendments or that we would not enter the requested Orders, including such a laundry list of conditions precedent to consummation increases the likelihood that a plan may be unable to be completed and, consequently, be followed by liquidation or further reorganization. Such a situation negatively impacts on the proposed plan's feasibility. However, Goldome does not focus on these issues, and only the changes in the partnership agreement, which Banks has raised in his objections, merit any further discussion. *See* pages 995–996 *infra.* We are therefore not prepared to deny confirmation on the basis of Wolk's failure to satisfy the requirements of § 1129(a)(11).

5. *Since Goldome Did Not Demand Personal Financial Statements from Wolk Until the Sixth Plan Was Under Consideration and Goldome Could Obtain (and We Believe Has Obtained) This Information Through a Bankruptcy Rule 2004 Examination, We Decline to Compel Wolk, at This Late Date, to Furnish Goldome with His Personal Financial Statements Pursuant to Bankruptcy Rule 1007(g) as a Condition of Confirmation.*

Goldome claims that "it is well established that a plan of reorganization cannot be determined to have satisfied 11 U.S.C. § 1129(a)(7) with respect to partnership debtors until the financial statements of the general partners have been examined." In support of its assertion, Goldome relies upon *In re M. Long Arabians,* 103 B.R. 211, 217 (Bankr. 9th Cir.1989), which holds that

[i]n order to have properly applied the 'best interests of creditors' test under Section 1129(a)(7)(ii), the bankruptcy court should have required Michael Long, as general partner of the debtor, to file a statement of assets and liabilities in conformance with Bankruptcy Rule 1007(g) prior to the confirmation hearing. Without this information, the court did not have a proper factual basis to make an informed decision when it entered its order confirming the Plan and finding compliance with Section 1129(a)(7).

In *Arabians* the court concluded that the information contained in the general partner's financial statements was "necessary" because, if the general partner is solvent and could satisfy any deficiency in the payment of the partnership debts, "then the Chapter 11 plan could not be confirmed unless the plan provided for a one hundred (100%) percent payout to all creditors." 103 B.R. at 217, quoting *In re Monetary Group*, 55 B.R. 297, 299 (Bankr.M.D.Fla. 1985). Similarly, other courts have concluded that it is necessary to determine the net worth of each of the partners of the partnership-debtor before it can be determined whether a plan can be confirmed under § 1129(a)(7). *See In re I-37 Gulf Limited Partnership*, 48 B.R. 647, 650 (Bankr.S.D.Tex.1985).

Bankruptcy Rule (hereinafter "B.Rule") 1007(g) appears to be the legal basis of this line of cases requiring general partners of partnership-debtors to produce personal financial statements as a condition precedent to confirmation. Speaking of that Rule, NORTON BANKRUPTCY LAW & PRACTICE, BANKRUPTCY RULES, Editor's Comment to Rule 1007(g), at 39 (1989–90 ed.), states as follows:

In addition, the court may require a general partner to file a schedule of personal assets and liabilities. This provision is designed to assist the implementation of a provision of the Code which makes the general partners liable to the trustee in the event the assets of the partnership are insufficient to pay partnership debts....

After this Commentary, Norton adds a footnote making specific reference to 11 U.S.C. § 723. *Id.* at 39, 40 n. 7. However, the court in *Monetary Group, supra,* 55 B.R. at 299, thusly concluded that B. Rule 1007(g) is not limited only to the implementation of 11 U.S.C. § 723: "The information contained as a statement of personal assets and liabilities filed by each general partner of a Chapter 11 partnership debtor would also help the Court determine whether the plan complies with 11 U.S.C. § 1129." *See also In re Diversified Investors Fund XVII,* 91 B.R. 559, 562–63 (Bankr.C.D.Calif. 1988) (In order for the court to make the § 1129(a)(7) finding and for the unsecured creditors to have adequate information to make an informed decision whether to support to reject the plan, the debtor must include the net worth of general partners in the liquidation analysis in the Chapter 11 disclosure statement.)

We do not interpret B.Rule 1007(g) as *requiring* a general partner to submit his or her personal financial statements. Rule 1007(g) clearly states merely that "the Court *may* require a general partner to file a statement of personal assets and liabilities with the court...." (emphasis added). We therefore have some discretion in determining whether Wolk's disclosure of his personal financial picture is a prerequisite to confirmation here.

In determining whether to exercise that discretion, we begin by observing that, if Wolk's personal financial statements had been critical to Goldome's assessment of his Plans, we would have expected that Goldome would have requested them with respect to the initial Plans filed by Wolk rather than to have waited until the confirmation hearing of the Sixth Plan to claim that the omissions of such statements were critical to confirmation of Wolk's Plan. We realize that the terms of each plan differed. However, since Goldome argues that personal financial statements are necessary because the general partners would be liable for any deficiency under any of the proposed plans, Goldome should have requested Wolk's personal financial statements with respect to the earlier Plans if

they were as essential as Goldome now argues.

When the issue of Wolk's obligation to disclose his personal financial status arose during the colloquy concerning confirmation of the Fifth Plan on October 24, 1989, we suggested that Goldome schedule a B.Rule 2004 examination of Wolk and obtain this information in that manner. Goldome ultimately did schedule such a B.Rule 2004 examination of Wolk, but, it delayed doing so until the week before the December 6, 1989, hearing. During that examination, the parties consulted the court for advice as to its proper scope. In accordance with what we believed to be the guidelines established in *In re South State Street Building Corp.*, 105 F.2d 680, 683–84 (7th Cir.1939), we permitted Goldome to obtain Wolk's overall financial statement and to probe all of his dealings related directly to the Debtor in detail. We only restricted Goldome from questioning Wolk in detail about his other business dealings. We therefore believe that Goldome obtained, in that examination, all that it was entitled to know about Wolk's personal financial status. It has failed to suggest any particulars in Wolk's financial picture which adversely impact upon its ability to determine what it would receive if the Debtor were liquidated under Chapter 7.

Therefore, while we believe that Goldome's contention that a partnership generally should disclose its general partners' personal assets and liabilities to comply with § 1129(a)(7)(A)(ii) has merit, we believe that Goldome has obtained sufficient information in this regard in this instance. Furthermore, Goldome's delay in requesting this information suggests its lack of indispensability in this particular case. Accordingly, we refuse to hold that any failure on the part of Wolk to supply a personal financial statement renders the Sixth Plan violative of § 1129(a)(7).

### 6. *The Sixth Plan Does Not Misclassify Goldome.*

■ Goldome claims that the classification of its unsecured deficiency claim in the Sixth Plan is improper and unfairly discrim-

inates against it. We view the issues of "classification" and "unfair discrimination" to be distinct and will discuss them separately.

Goldome contends that the Sixth Plan is unconfirmable because it places the unsecured portion of its claim in Class 4B, apart from the other unsecured creditors which are included in Class 4A. Classification of claims is governed by § 1122(a) of the Code which provides:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.

■ The Code therefore does not require that all similarly-situated claims be classified together but, rather, that any claims that are classified together be substantially similar. *See* 5 COLLIER, *supra,* ¶ 1122.03–.04 at 1122–10 to 1122–11, 1122–18. While some courts have held that all unsecured claims must be placed into the same class, *see, e.g., Granada Wines v. New England Teamsters & Trucking Industry Pension Fund,* 748 F.2d 42, 46 (1st Cir.1984); and *In re Fantastic Homes Enterprises, Inc.,* 44 B.R. 999, 1000–01 (Bankr.M.D.Fla.1984), most courts have determined that Congress intended the classification provisions of § 1122 to be applied flexibly. *In re Northeast Dairy Cooperative Federation, Inc.,* 73 B.R. 239, 250 (Bankr.N.D.N.Y.1987). *See also In re Jersey City Medical Center,* 817 F.2d 1055, 1061 (3d Cir.1987) ("we agree with the general view which permits the grouping of similar claims in different classes."); *Barnes v. Whelan,* 689 F.2d 193, 201 (D.C. Cir.1982) ("[Code § 1122(a)] does not require that similar claims *must* be grouped together, but merely that any group created must be homogenous."); *Greystone, supra,* 102 B.R. at 568 ("Section 1122 authorizes flexibility in classification in furtherance of the rehabilitative intentions of Chapter 11."); and *In re Meadow Glen, Ltd.,* 87 B.R. 421, 424 (Bankr.W.D.Tex. 1988) ("Creating classes—even 'creative' creation of classes—is both simple and

(usually) lawful."). *See also generally U.S. Truck, supra,* 800 F.2d at 584–87; and *AG Consultants, supra,* 77 B.R. at 670–76.[13]

Plan proponents, however, do not have free reign with respect to classification. The Fifth Circuit noted that

> [a]s a general rule the classification in a plan should not do substantial violence to any claimant's interest. The plan should not arbitrarily classify or discriminate against creditors.

*In re LeBlanc,* 622 F.2d 872, 879 (5th Cir. 1980). The Sixth Circuit also observed that

> [t]here must be some limit on a debtor's power to classify creditors in such a manner [to assure that at least one class of impaired creditors will vote for the plan and make it eligible for cram down under § 1129(b) of the Code.] The potential for abuse would be significant otherwise.

*U.S. Truck, supra,* 800 F.2d at 586.

■ Whenever a plan proponent manipulates classification solely to defeat the Code's goal of equal treatment of similarly situated creditors, such a plan may not be confirmed. *Northeast Dairy, supra,* 73 B.R. at 250. *See also In re Mastercraft Record Plating, Inc.,* 32 B.R. 106, 108 (Bankr.S.D.N.Y.1983) *rev'd on other grounds,* 39 B.R. 654 (S.D.N.Y.1984); and *Pine Lake Village, supra.*

In *Greystone, supra,* a secured creditor, Phoenix Mutual Life Insurance Company ("Phoenix"), objected to the debtor's proposed plan because it classified Phoenix's unsecured deficiency claim separately from the debtor's other unsecured claims. 102 B.R. at 561–62. Phoenix argued that its separate classification "represents blatant 'gerrymandering' which if nothing else, violates the 'good faith' requirement imposed by Section 1129(a)(3)." *Id.* at 568.

The bankruptcy court, in *Greystone, supra,* was not persuaded by Phoenix's objec-

tions, stating that "a demonstrated economic need to treat certain otherwise similar claims differently" and the "legal character of a claim" may "justify disparate classification." *Id.* at 569. The court concluded that the separate clarification of the unsecured creditors and Phoenix was justified because the other unsecured creditors, which were trade creditors, had unique legal rights against the general partners of the debtor which Phoenix did not. The court also noted that the debtor's need to remain on good terms with the trade creditors for the sake of future operations is an "independent reasonable ground ... for separate classification." *Id.*

The facts of *Greystone* are similar to those in the case *sub judice.* We agree with its result and the other above-cited cases that courts should permit flexible classification of claims, and, finding actual differences in the nature of the claims in Classes 4A and 4B of the Sixth Plan, we conclude that Goldome's unsecured deficiency claim is not misclassified by the Sixth Plan.

7. *However, the Sixth Plan Cannot Be Confirmed Because It Unfairly Discriminates Against Goldome's Unsecured Deficiency Claim.*

■ Having rejected five of the grounds on which Goldome objected to confirmation of the Sixth Plan, we now address those objections which we deem to have merit and to require that confirmation of the Sixth Plan be denied. The first objection which we believe has merit concerns the Plan's *treatment* of Goldome's claim, as opposed to its classification.

*Johns–Manville, supra,* 68 B.R. at 636, stated the proposition that all similarly situated creditors must be treated equally as follows:

> Generally speaking, [the prohibition of unfair discrimination] ensures that a dis-

---

13. We are aware of a line of cases including *Meadow Glen, supra;* and *In re Pine Lake Village Apartment Co.,* 19 B.R. 819 (Bankr.S.D.N.Y. 1982), some of which we have cited to for other propositions, which hold that "[w]hen the general unsecured and deficiency claims are split, the policy behind § 1111(b) is violated, for the

voice given the deficiency is taken away." *Meadow Glen,* 87 B.R. at 426–27. We find the case law favoring flexible classification, and the reasoning contained therein, to be more persuasive and to correctly state the intent of the Code and its drafters.

senting class will receive relative value equal to the value given to all other similarly situated classes (citations omitted).

Thus a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes.

▆ Thus, while a plan proponent may separately classify similarly situated creditors, "[o]ne of the cardinal principles underlying bankruptcy law is equality of treatment of similarly situated creditors." 5 COLLIER, *supra*, ¶ 1122.04, at 1122–18. Separately classified but similarly situated creditors must be treated equally. *U.S. Truck, supra,* 800 F.2d at 587.

The Sixth Plan proposes to pay Classes 4A and 4B, which include all unsecured claims, two (2%) percent of their allowed claims without interest. However, Wolk then intends to personally pay the Class 4A unsecured creditors an additional thirty-eight (38%) percent in cash plus the remaining sixty (60%) percent of their allowed claims over time pursuant to a note. However, on account of *its* Class 4B unsecured claim, Goldome will receive nothing more than the two (2%) percent initial distribution proposed by the plan. Goldome, as might be expected, argues that the Sixth Plan unfairly discriminates against it by treating its unsecured claim differently from the other unsecured claims.

▆ The plan proponent has the burden of proving the rationale for any proposed discrimination in treatment of creditors. *In re Furlow,* 70 B.R. 973, 977 (Bankr.E.D. Pa.1987) (interpreting comparable Chapter 13 sections, 11 U.S.C. §§ 1322(a)(3) and (b)(1)).[14] *Accord, In re Wolff,* 22 B.R. 510 (Bankr. 9th Cir.1982); *In re Gibson,* 45 B.R. 783 (Bankr.N.D.Ga.1985); *In re Girardeau,* 35 B.R. 9 (Bankr.D.S.C.1983); and *In re Moore,* 31 B.R. 12 (Bankr.D.S.C. 1983). Wolk's rationale for the disparate treatment of the unsecured claims is that the Class 4A claimants are justified in re-

ceiving the additional ninety-eight (98%) percent distribution from Wolk, because, unlike Goldome, they are recourse creditors with claims against Wolk personally, as a general partner of the Debtor. By way of contrast, Wolk contends that, since he is not potentially liable to Goldome as a general partner, Goldome is a non-recourse creditor and he has no duty to give Goldome anything in addition to the two (2%) percent distribution from the Debtor. In other words, according to Wolk, Classes 4A and 4B receive equal distributions of two (2%) percent from the Debtor. The unsecured recourse creditors in Class 4A receive an additional payment of ninety-eight (98%) percent from Wolk, personally, on account of Wolk's personal liability to Class 4A as a general partner. Since Goldome's unsecured claim is non-recourse, Wolk contends that he is not liable to Goldome for any additional amounts. Therefore, he argues that the disparate treatment of the two classes is rational.

What Wolk fails to mention, and what we believe is critical, is that Goldome does have a claim against Wolk personally pursuant to the Wolk's guarantee of the Goldome Mortgage. The Class 4A claimants have unsecured claims against the Debtor and claims against Wolk personally as a general partner. Similarly, Goldome has an unsecured claim against the Debtor and a claim against Wolk personally as a guarantor.

In refining the tests for detecting unfair discrimination proposed by *Wolff,* 22 B.R. at 512; and *In re Ratledge,* 31 B.R. 897, 899 (Bankr.E.D.Tenn.1983), we formulated, in *Furlow, supra,* 70 B.R. at 978, the following test for determining if a plan is unfairly discriminatory:

> different treatment is permissible if and only if the debtor is able to prove a reasonable basis for the degree of discrimination contemplated by the Plan.

In *Furlow,* a Chapter 13 debtor filed a plan proposing to pay forty (40%) percent

---

14. Although *Furlow* was a Chapter 13 case, we note that § 1322(b)(1), one of the sections of Chapter 13 relative to discrimination of treatment creditors makes specific reference to des-

ignation of classes "as provided in section 1122 of this title." Therefore, the tests for discrimination in § 1122 and § 1322 appear to be intended to be the same.

of the claim to her unsecured educational loan creditor, while paying other unsecured creditors only ten (10%) percent of their claims. We concluded that the fact that the educational loan was nondischargeable in a Chapter 7 case did not provide a reasonable basis for the discrimination in favor of the educational lender in the plan, and we refused to confirm the debtor's plan. *Id.* at 978.

Goldome cites to *Eisenbarth, supra,* in support of its claim of unfair discrimination. The court, in *Eisenbarth,* was confronted with a Chapter 11 plan which proposed to pay unsecured trade creditors claims in full while paying an under-secured creditor only ten (10%) percent on account of the unsecured portion of its claim. 77 B.R. at 232. The court refused to confirm the plan and found unpersuasive the debtor's "attempt to draw a distinction between sophisticated institutions ... as contrasted to unsecured local trade creditors." *Id.* at 235. The court noted that, while many debtors may prefer to pay local businesses in full for the sake of future business at the "expense of banks and other lenders, this treatment is not sanctioned by the Bankruptcy Code." *Id.* at 235. *See also In re AOV Industries, Inc.,* 792 F.2d 1140, 1150 (D.C.Cir.1986). The *Eisenbarth* court thus concluded, 77 B.R. at 236:

> An unsecured claim is simply that, an unsecured claim. No valid reason exists for treating the unsecured claims of [the secured lenders] different than the unsecured claims of the trade creditors.

*See also In re Aztec Co.,* 107 B.R. 585, 588–92 (Bankr.M.D.Tenn.1989) (discrimination of treatment of creditors which is "unfair" is prohibited by § 1129(b)(1)).

Wolk, in support of the Sixth Plan's disparate treatment of Classes 4A and 4B, relies heavily upon *Greystone, supra.* In *Greystone,* the undersecured creditor's unsecured deficiency claim was classified separately from the claims of the unsecured trade creditors. The court was not persuaded that the proposed classification scheme violated the Code and also held that the plan did not discriminate against the undersecured creditor's unsecured claim

because "the debtor ... accorded its trade debt precisely the same dividend as ... its Code created deficiency claim, and in doing so, has satisfied the technical specifications of Section 1129(b) that the plan not 'unfairly discriminate' against the dissenting class." *Id.* at 571. Actually, however, the total amount recovered by the two classes was different because the recourse trade creditors were directed to seek additional recovery from the debtor's general partners outside of the plan. Wolk maintains that the Sixth Plan is similar to the in *Greystone, supra,* but that, "in the spirit of full disclosure," he placed the payments by him, as general partner, into the terms of the plan.

Wolk's reliance on *Greystone* is misplaced. Unlike *Greystone,* the non-recourse undersecured creditor here, Goldome, has a personal guarantee from Wolk. Hence, while the Sixth Plan proposes to make additional payments to Class 4A claimants on account of their claims against Wolk personally as a general partner, it proposes to make no additional payments to Goldome on account of its claim against Wolk personally as a guarantor.

Outside of bankruptcy, the respective claims of Goldome and of the Class 4A claimants against Wolk personally would be on equal footing. However, here, the terms of the Sixth Plan tip the scale in favor of the Class 4A claimants by proposing to pay them in full, while paying nothing to Goldome on account of the Wolk's guarantee to it.

As stated by 5 COLLIER, *supra,* ¶ 1129.03 at 1129–50,

> a dissident class must not only receive "fair and equitable" treatment but the class must also receive treatment which allocates value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor.

The Sixth Plan does not provide Class 4A and 4B, classes with similar legal claims, with equal treatment. Although the Class 4A and Class 4B claims emanate from different legal theories, *i.e.,* Wolk as a general partner as opposed to Wolk as a personal

guarantor, both the Class 4A claimants and Goldome, the Class 4B claimant, have unsecured claims against the Debtor which include the right to assert a claim against Wolk individually. We find no reasonable justification for treating the unsecured portion of Goldome's claim, in Class 4B, differently from the claims of the other unsecured creditors in Class 4A.

Here, as in *Furlow, supra,* we find that the Sixth Plan has failed the test for determining whether discrimination in treatment of different claim classes is justified. Therefore, this Plan cannot be confirmed.

8. *The Sixth Plan Also Cannot Be Confirmed Because It Does Not Provide Goldome with an Effective Election Under § 1111(b)(2).*

The Sixth Plan provides that, if Goldome makes the § 1111(b)(2) election, then it will receive the Election Note secured by the Election Mortgage. Goldome argues that the terms of the Election Note and Election Mortgage do not comply with the requirements of §§ 1111(b)(2) and 1129(b)(2) because (1) the Election Note is for the principal amount of its allowed secured claim, $4.2 million, and not in the principal amount of its allowed claim, $6.5 million, as required by §§ 1111(b) and 1129(b)(2); (2) the interest rate of the Election Note is insufficient; and (3) the lien afforded Goldome by Election Mortgage is not of equal value to Goldome's present lien on the Property, because the Election Mortgage strikes the present mortgage's (a) "due-on-sale" clause; and (b) prohibition on placing subordinated mortgages on the property; and (c) permission to Goldome to assign the mortgage.

The terms of the Election Note and the Election Mortgage are summarized at page 981 *supra.* Basically, the principal amount of the Election Note, $4.2 million, is due and payable on the tenth anniversary of the note. Interest, calculated at the rate of eleven (11%) percent, is due and payable monthly unless the Debtor elects (with no notice to Goldome required) to defer such interest for eighteen (18) months. None of the Debtor's partners will have personal liability for any amounts due under the Election Note. Pursuant to the Election Mortgage, Goldome will retain its first lien on the Property.

Sections 1111(b)(2) and 1129(b)(2) provide that an electing creditor must receive payments equal to the total amount of its allowed claim, which payments must have a present value equal to not less than the value of the security which collateralizes the claim. Section 1129(b)(2)(A) states that with respect to a secured claimant, the proposed plan will satisfy the fair and equitable requirement of § 1129(b) if it provides

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, ...

What an electing creditor must receive under a Chapter 11 plan for that plan to be confirmable is correctly and clearly explained by at 5 COLLIER, *supra,* ¶ 1111.02[5], at 1111–27 to 1111–28:

Although the [creditor] that exercises the [§ 1111(b)(2) ] election has a right to receive the full amount of [its] allowed claim ... over time, section 1129(b)(2)(A) permits the court to approve the plan notwithstanding the opposition of such [creditor] as long as the plan provides that [the creditor] shall receive deferred cash payments totaling at least the allowed amount of the creditor's claim. In addition, such payments must have a present value of the claimant's interest in the collateral (footnote omitted).

Attached to the Sixth Plan as Exhibit "F" is the Mortgage Promissory Note Wolk intends to use for the Election Note. In the first paragraph of Exhibit "F," the document states that the "principal sum of Four Million Two Hundred Thousand and no/100 ($4,200,000.00) dollars" is due and payable under the note. Also, in the upper left hand corner of Exhibit "F" is the fig-

ure "$4,200,000.00." There is no doubt that the principal amount of the Election Note is the amount of Goldome's allowed *secured* claim and not, as required, the total amount of Goldome's allowed claim, $6.5 million. If Goldome made the election and accepted the Election Note, it would be accepting $2.3 million less than the amount to which it was entitled. Under such circumstances, the Sixth Plan clearly denies Goldome an effective election under § 1111(b)(2) and, therefore, cannot be confirmed. *See In re Arnold*, 806 F.2d 937, 940 (9th Cir.1986); *In re Polytherm Industries, Inc.*, 33 B.R. 823, 838 (W.D.Wisc. 1983); *In re Dilts*, 100 B.R. 759, 761–62 (Bankr.W.D.Pa.1989); and *In re S.E.T. Income Properties, III*, 83 B.R. 791, 793 (Bankr.N.D.Okla.1988).

 While § 1129(b)(2)(A)(i) specifically permits deferred payments, we question, like Goldome, the permissibility of the extended length of time that Goldome's principal and interest is deferred and the interest rate that is provided to it under the Sixth Plan. The Election Note provides that payment of principal is deferred for ten (10) years and that interest, calculated at the rate of eleven (11%) percent, may be deferred for eighteen (18) months without notice by Wolk to Goldome.

At the hearing on December 6, 1989, Goldome called and successfully qualified Reaves C. Lukens, Jr. (hereinafter "Lukens"), as an expert witness on real estate financing.[15] Lukens testified that he did not believe that it was possible to obtain a mortgage and note with the terms of the Election Note and Election Mortgage in the conventional financing market. He further stated that the interest rate charged on a loan is a function of risk, the term of the loan, and the frequency of interest payments. Considering the risk involved in rehabilitating the Property, the deferral of interest permitted, and the ten year period until payment of interest, Lukens opined that, with an eighty (80%) percent loan-to-value-of-collateral ratio, a more realistic interest rate would be between thirteen and a half (13½%) percent and fifteen (15%) percent. It should be noted that the Election Note provides a one hundred (100%) percent loan-to-value ratio. Therefore, the more realistic interest rate would actually be something higher than that proposed by Lukens. Lukens also testified that the present value of the Election Note was approximately $3.3 million as opposed to the required $4.2 million, the value of Goldome's interest in the Property.

The Debtor presented no expert testimony to rebut Lukens' determination of the present value of the Election Note. Accepting Lukens' testimony, we conclude that the present value of the Election Note is not the value of Goldome's interest in the Property as required by § 1129(b)(2)(A) and, for this additional reason, the Sixth Plan fails to offer Goldome an effective election under § 1111(b)(2).

When asked why he chose eleven (11%) percent as the interest rate for the Election Note, Wolk offered several reasons, including that he recently borrowed funds at this rate and that it is higher than the present prime interest rate. Wolk then attempted to argue that Goldome should accept this rate because he was ready to invest millions of dollars into the Property, the fruits of which would benefit Goldome.

As stated by 5 COLLIER, *supra*, ¶ 1129.03[4][i], at 1129–62,

> deferred payment of an obligation under a plan is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, durations, collateral and risks.

We will not, at this time, discuss the bountiful case law in this area or attempt to determine what the appropriate interest rate for the Election Note should be because of its other fatal flaws. *Cf. In re Mitchell*, 77 B.R. 524 (Bankr.E.D.Pa.1987) (this case law is discussed and we concluded that, where no evidence is presented, the interest rate, for purposes of

---

**15.** Lukens was recognized as Goldome's "impressively competent appraiser" in the § 506

adversary proceeding. *See Opinion II,* 105 B.R. at 800.

§ 1325(a)(5)(B)(ii), is established at the lower of the rate of the mortgage contract being liquidated and the "market rate," measured by the Treasury bill yield due to mature on the date of the deferred obligation plus one (1%) percent). Suffice it to say, however, that the present rate set forth in the Election Note is insufficient in light of the risks inherent in the rehabilitation of the Property, the term of the loan, and the ability to defer interest, and warrants a conclusion that the Sixth Plan fails to provide Goldome with an effective election under § 1111(b)(2).[16]

As we stated earlier, we are also troubled by the length of time for which payments are deferred under this Plan in light of § 1129(b)(2)(A). In *In re D & F Construction, Inc.*, 865 F.2d 673, 676 (5th Cir. 1989), the court refused to confirm a plan involving a § 1111(b)(2) election which proposed the pay the electing creditor no principal for fifteen years and, while the debtor proposed to pay interest monthly, there was a negative amortization of interest for twelve years. By way of contrast, the instant Election Note proposes to delay repayment of principal for ten years, pays an insufficient interest rate, and does not include a payment of monthly interest. We therefore conclude that, on the whole, the terms offered are no better than those found inadequate by the court in *D & F Construction.*

In *In re Hollanger*, 15 B.R. 35, 45–46 pertinent to (Bankr.W.D.La.1981), the court, reviewed legislative history pertinent to § 1129, and addressing § 1129(b)(2)(A)(i) in light of its findings determined that,

based on the case of *In re Murel Holding Corp.*, [75 F.2d 941 (2d Cir.1935)], creditors may not be deprived of receiving payment(s) for an unreasonably long period of time.

The court in *Murel, supra*, refused to confirm a plan which proposed no principal payments for ten years and required the mortgagee to forego amortization payments. Even though the plan rejected in *Murel, supra*, differs from the Sixth Plan in that, being a case which preceded the Code, it did not involve an electing creditor under § 1111(b)(2), it presents facts and reasoning which are, nonetheless, analogous to the present situation. It is clear that long delays in the repayment of principal and the deferral of interest do not provide unsecured creditors, such as Goldome, with adequate repayment of their obligations. We therefore conclude that the Election Note defers the principal payments for too great a period of time, particularly since it permits Wolk to defer interest payments as well.[17]

In addition to containing terms contemplating insufficient payment of interest and excessive deferrals of principal and inter-

---

**16.** We note that the risks here are much greater than those presented by the deferral of payment of the Mitchells' home mortgage over five years. We also note that Collier suggests different approaches in discussing appropriate interest rates under § 1129 (see the quote in the last paragraph) as opposed to § 1325(a)(5)(B)(ii). *Compare* 5 COLLIER, *supra*, ¶ 1325.06, at 13251–37 to 1325–38. As we note in *Mitchell*, the latter passage, considering the plight of consumers trying to save homes, represents more of a debtor vantage-point, while the passage relative to §§ 1129 reflects, in the context of business financing, more of a creditor vantage-point. 77 B.R. at 527–27.

Unlike *Mitchell*, where neither party put on any evidence of the optional interest rate, 77 B.R. at 529, we have the testimony of Lukens in the record of the instant case.

**17.** In support of its contention that the deferral proposed is reasonable, Wolk relies heavily upon *In re Spanish Lake Associates*, 92 B.R. 875

(Bankr.E.D.Mo.1988), which states that neither deferrals of principal and interest nor negative amortization are *per se* objectionable. *Id.* at 878, 879. Proposed in *Spanish Lake* is a five element test for "fairness" and "equity" including the length and amount of deferral of principal and interest, the ratio of the debt to the collateral, and the quality of the collateral. *Id.* at 878. In *Spanish Lake* the court rejected a plan which proposed deferral of principal for seven years and deferral of interest at an accelerating rate over seven years, including a ratio of debt to collateral "as high as" 86.5%, and proposal renovation of apartments possibly having a twenty-eight (28%) vacancy rate. *Id.* at 876–77, 879. The deferral of principal proposed here is for a longer period than seven years, the ratio of debt to collateral is over one hundred (100%) percent, and the quality of the collateral here, a Property which has an *occupancy* rate of less than twenty (20%) percent, is extremely poor. Therefore, the result in *Spanish Lake* does not support Wolk's position.

est, the Election Mortgage contemplates several changes of the terms of the present mortgage—the striking of the "due-on-sale" clause, the prohibition on placing subordinated mortgages on the Property, and the right of Goldome to assign the mortgage. These elements, as Wolk suggests, are correctable. However, they merely contribute to the cumulative effect of terms which fail to allow an adequate § 1111(b) election to Goldome.

Consequently, we find that, for several reasons, requiring Goldome to accept the Election Note and Election Mortgage fails to provide Goldome with an effective election under § 1111(b)(2). For this reason as well, the Sixth Plan cannot be confirmed.

### E. TWO OTHER OBJECTIONS NOT FULLY DEVELOPED OR ARGUED, *E.G.*, BANK'S CLAIM THAT THE SIXTH PLAN VIOLATES THE DEBTOR'S PARTNERSHIP AGREEMENT, AND WOLK'S ATTEMPT TO HAVE CONFIRMATION TRIGGER A RELEASE OF HIS INDIVIDUAL LIABILITY, APPEAR TO HAVE MERIT.

Banks claims that the three proposed methods of implementing the Sixth Plan, *see* pages 981–982 *supra,* are not only not sales, they are also not "transfers," and are actually partnership reorganizations in violation of the Debtor's Partnership Agreement. Wolk does not contend that the methods of implementation proposed in the Sixth Plan are in compliance with the Partnership Agreement. In fact, he conditions the consummation of the Sixth Plan upon the acceptance by Nassau County, New York, of certain undisclosed amendments to the Partnership Agreement, suggesting an awareness that his Plan does contemplate amendment of the Partnership Agrement.

However, at the Confirmation hearing of December 6, 1989, Banks chose to present worthless testimony, *see* pages 974–975 & n. 3 *supra,* rather than placing into the record either the Partnership Agreement or the proposed amendments thereto, which would be necessary to support his Objections. We cannot decide the issue of whether a plan violates the Partnership Agreement on a theoretical basis in a total factual vacuum. We therefore can note only that the theoretical basis appears to have merit. *See In re Sovereign Group, 1984-21, Ltd.,* 88 B.R. 325, 329–32 (Bankr. D.Colo.1988). An attempt to leap over legal impediments to a plan's confirmation by mere inclusion of provisions eliminating impediments to the plan is not generally well-taken. *Cf. In re Gurst,* 76 B.R. 985, 989–91 (Bankr.E.D.Pa.1987) (it is inappropriate to "load up" a Chapter 13 plan with provisions of doubtful legal propriety).

We are also concerned about the provisions of both the Fifth Plan, *see* ¶ 9.2, described at page 976 *supra,* and the Sixth Plan (which contains an identical provision in ¶ 10.2), providing that confirmation of the Plan constitutes a release of any individual claim of a holder against not only the Debtor, but against non-debtors Wolk and Banks and their respective heirs as well. Goldome gives only slight attention to its objection that the foregoing Plan provisions are violative of 11 U.S.C. § 524(e) and Banks, as a recipient of the release, quite naturally raises no objection thereto.

We find the instant plan provisions distinct from those in which each creditor is accorded an opportunity to make an individual decision as to whether to accept a plan which provides for release of a non-debtor as a condition of acceptance. *Compare In re TM Carlton House Partners, Ltd.,* Misc. No. 89–0347 (E.D.Pa. June 23, 1989) (district court Order denies a stay pending an appeal from our Order of May 31, 1989, in Bankr. No. 88–10774S, confirming a plan containing such a provision); and *In re Monroe Well Service, Inc.,* 80 B.R. 324, 334–35 (Bankr.E.D.Pa.1987) (plan containing such a provision confirmed), *with Underhill v. Royal,* 769 F.2d 1426, 1432 (9th Cir.1985); *Union Carbide Corp. v. Newboles,* 686 F.2d 593, 595 (7th Cir.1982); and *In re Elsinore Shore Associates,* 91 B.R. 238, 246–56 (Bankr.D.N.J.1988) (provision that event of confirmation will effect a release is violative of § 524(e) and renders a plan objectionable). Under the terms of

the instant Plans, a creditor voting against the Plans and hence not individually accepting the releases could be bound to the releases terms. Therefore, were there no other, more significant grounds for denying confirmation, we would have been obliged to deny confirmation of both Plans on the basis of this objection as well.

## F. GOLDOME'S PLAN OF REORGANIZATION PRESENTS AN ALTERNATIVE PROVIDING A DISTRIBUTION TO UNSECURED AND ADMINISTRATIVE CREDITORS, PROMPTING US TO ALLOW WOLK TO FILE ANOTHER AMENDED PLAN ONLY IF GOLDOME WITHDRAWS OR SUBSTANTIALLY ALTERS ITS PROPOSED PLAN.

Goldome's Plan, conveniently submitted to us on December 6, 1989, proposes to fund a distribution to the unsecured and administrative creditors even though Goldome's debt exceeds the value of the Property. This Plan presents a contrast to the alternative to confirmation of Wolk's Plans which Goldome had earlier proposed, *i.e.,* dismissal or conversion to Chapter 7, as per its § 1112(b) motion.

Goldome's Plan contemplates a monetary contribution on its part of $150,000, which will pay administrative claimants in full and is estimated will allow the unsecured creditors to receive approximately thirty-two (32%) percent of their allowed claims, without interest, in cash, on the distribution date. Not surprisingly, however, the Debtor's general and limited partners will receive nothing under the Goldome Plan and the general partners, Wolk and Banks, would not be released from any personal liability they may have as either general partners or guarantors. By the terms of its Plan, Goldome would receive all of the

Debtor's interest in the Property, all of its other tangible and intangible personal property, and all of the Debtor's claims against third parties.

We have not had the opportunity to review Goldome's Plan in detail and the time for voting on it and filing objections to it has not run its course. The hearing on the approval of Goldome's disclosure statement is not scheduled until January 10, 1990. We can therefore hazard no decision regarding the confirmability of Goldome's Plan. However, we believe that its submission is a responsible measure on the part of Goldome which reflects concern with other players in this case, as well as an attempt to achieve the expedient end of bringing some measure of consensus and speed of ultimate resolution to the conflicts surrounding the Debtor.[18] Such responsible actions of creditors makes upholding their positions infinitely more palatable. *Compare Gulph Woods, supra,* 84 B.R. at 963, 964, 975 (denial of confirmation of debtor's plan and granting of § 362(d) relief was made conditional on secured creditor's making distributions in accordance with its proposed competing plan).

Our previous stream of Orders and our comments to counsel at various hearings have clearly suggested that the Sixth Plan will be received as the last attempt by Wolk at achieving confirmation of a plan of which he is proponent. *See* pages 974–75 *supra.* In our Order accompanying this Opinion, we recite that, if Goldome withdraws or substantially changes its plan, Wolk will be given the opportunity to file another plan. However, court permission must precede any further attempts by Wolk at proposing a plan, lest he continue to engulf us with further amended plans indefinitely.

---

18. We have only briefly touched upon the veritable war between Banks and Wolk which has pervaded this bankruptcy case throughout its course. *See Opinion I, supra,* 99 B.R. at 641–43. On November 7, 1989, we were compelled to issue an Order imposing sanctions of $20,000 plus attorneys fees and costs against Banks in favor of Wolk when Banks refused to comply with our Order of September 6, 1989, displacing him with Wolk as the Debtor's managing partner and requiring him to turn over all of the Debtor's records to Wolk. The latest salvo in the fray is a federal lawsuit brought against Wolk and Brad Cohen and his associates (also targets of the cross-claim in the proceeding described in Opinion I) by Banks, the federal count in which was recently dismissed and which case was thereupon transferred to the state courts. *Banks v. Wolk,* C.A. No. 89–7219, 1989 WL 153936 (E.D.Pa. Dec. 14, 1989).

### G. CONCLUSION

An Order consistent with this Opinion will be entered.

### ORDER

AND NOW, this 4th day of January, 1990, after carefully reviewing all submissions by the parties and after a hearing on December 6, 1989, on the Fifth Amended and Restated Plan of Reorganization and the Sixth Amended and Restated Plan of Reorganization submitted by Donald L. Wolk (hereinafter "Wolk"), and the Objections thereto by Goldome Realty Credit Corp. ("Goldome"), and by Philip J. Banks, it is ORDERED as follows:

1. Confirmation of both of the aforesaid Plans is DENIED.

2. Wolk may not submit any additional plans of reorganization without further permission of this court. However, should Goldome withdraw its Plan of Reorganization dated December 1, 1989, or substantially modify same, this court will, in all probability, permit Wolk to submit a further plan of reorganization.