**In re 641 ASSOCIATES, LTD., Debtor.**

**641 ASSOCIATES, LTD., Plaintiff,**

**v.**

**BALCOR REAL ESTATE FINANCE, INC., Defendant.**

Bankruptcy No. 91–11234S.
Adv. No. 92–0036S.

United States Bankruptcy Court, E.D. Pennsylvania.

May 13, 1992.

Lawrence J. Tabas, Obermayer, Rebmann, Maxwell, & Hippel, Philadelphia, Pa., for debtor, plaintiff.

Bruce Roswick, New York City, Jeffrey Meyers, Philadelphia, Pa., for defendant.

David J. Toll, Patterson & Weir, Philadelphia, Pa., for Continental Bank.

Matthew J. Gold, Schulte Roth & Zabel, New York City, for Citicorp/Citibank.

Frederic Baker, Philadelphia, Pa., Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Presently before us in the voluntary Chapter 11 bankruptcy case of 641 Associates, Ltd. ("the Debtor"), a single-asset realty partnership, are (1) the Debtor's request that we confirm its First Amended Plan of Reorganization ("the Plan") over the opposition of the Debtor's principal secured lender, Balcor Real Estate Finance, Inc. ("Balcor"); (2) a motion of Balcor seeking relief from the automatic stay ("the Motion") to foreclose upon the Debtor's realty asset, a commercial building located at 641 Avenue of the Americas, Manhattan, New York, New York ("the Property"); and (3) an adversary proceeding ("the Proceeding") instituted by the Debtor against Balcor which is in substance a counterclaim to Balcor's secured proof of claim.

We rule against the Debtor in the Proceeding, since we find that Balcor's alleged wrongful conduct was not illegal and the possible inequities of its actions were timely and promptly remedied. We are unable to confirm the Plan, but only because we find that its treatment of Balcor's claim must be adjusted somewhat to account for the results in the Proceeding, and the Plan's feature of certain "negative amortization" and otherwise confusing treatment of Balcor's claim. However, we reject Balcor's claims that (1) it has a security interest in the Debtor's rents, under applicable New York law, which could preclude their use to pay other creditors without Balcor's consent, and (2) the absolute priority rule applies, since all unsecured classes have accepted the Plan.

Since it appears that the Debtor can present and confirm a slightly amended plan, we will deny the Motion on the condition that the Debtor or any other interested party promptly proceeds to amend the Plan as suggested herein.

### B. PROCEDURAL HISTORY

The underlying instant bankruptcy case was filed on March 4, 1991. On April 25, 1991, we denied a motion of Balcor, which has asserted a secured claim of over $17 million, to change the venue of this case to the situs of the Property, the Southern District of New York, principally due to opposition from the Debtor's largest (over $3 million) unsecured creditor, Continental Bank ("Continental"); and its only other (owed about $2.7 million) secured creditor, Citicorp/Citibank ("Citicorp").

On August 26, 1991, Balcor filed the Motion. On September 26, 1991, the initial hearing date on the Motion, Balcor agreed to continue the hearing until November 20, 1991, the projected date of a hearing on the Disclosure Statement ("the D/S"), which it was anticipated would accompany the Debtor's forthcoming plan. Unfortunately, when the Debtor ultimately filed its Plan and D/S, the hearing to consider the D/S was listed on November 27, 1991. On November 20, 1991, Balcor's New York counsel appeared with Henry Boeckmann, Jr., a New York-based appraiser. The Debtor stated that it believed that the hearing was

on November 27, 1991, but its counsel ultimately conceded that he had failed to timely communicate same to Balcor's counsel, as the court had requested. We therefore commenced the hearing on November 20, 1991, allowing Boeckmann to testify, but also allowing any interested parties to present additional evidence on November 27, 1991.

Finding, at the close of the hearings on the Motion, that the Debtor had established that it had the clear probability of obtaining confirmation of a plan, we entered an Order continuing the stay in effect pending a confirmation hearing on the Debtor's initial plan on January 22, 1992. *See In re Franklin Pembroke Venture II*, 105 B.R. 276, 277–79 (Bkrtcy.E.D.Pa.1989).

An Amended D/S was ultimately approved on December 19, 1991, and in fact a consolidated hearing on confirmation of the Debtor's Plan, which was amended slightly on January 21, 1992, and the Motion came to pass on January 22, 1992. Briefs from the Debtor and Balcor, the only objector to confirmation, were directed to be filed by February 12, 1992, and March 4, 1992.

The Proceeding was commenced on January 13, 1992. Balcor's Motion to Dismiss this matter was summarily denied by this court on February 20, 1992, as it seemed clear that it raised disputed issues of material facts. Trial was set for March 4, 1992.

With the mutual support of the parties, a conference to attempt to reach a global settlement of all of the disputes between the parties was listed before the Honorable Judith H. Wizmur of the District of New Jersey on February 21, 1992. Judge Wizmur reported substantial progress at the initial and subsequent conferences, and we accordingly granted the parties' mutual request to continue the trial of the Proceeding until April 9, 1992, with the firm expectation that a final amicable resolution would be reached in the interim. We were therefore surprised and disappointed to learn, on April 9, 1992, that the parties had not settled, and the Proceeding had to be tried that day. Unfortunately, the hiatus caused by the unexpected snag in the settlement process has delayed the output of this decision.

## C. PERTINENT FACTS AND POSITIONS OF THE PARTIES

The facts of this case are gleaned from the records of the hearings of November 20, 1991; November 27, 1991; and January 22, 1992, all consolidated into the record on confirmation and the Motion; and, as to the Proceeding, at the trial of April 9, 1992. The parties' briefing on confirmation has centered our focus on certain provisions of the Plan, particularly its treatment of Balcor, and certain of the Objections of Balcor thereto.

The Plan provides, as to Class 3, which included only Balcor, that, if Balcor's claim is fixed at $15 million, then Balcor will—

1. Be paid interest at the rate of 10.18 percent, which the Debtor contends is the contract (non-default) rate.

2. For the first two years after the effective date of the Plan, receive monthly payments of the lesser of its interest payment or the Debtor's net cash flow from the preceding month.

3. For the next three years, receive full interest payments plus any shortfall in the first two years' interest payments.

4. On the fifth anniversary of the effective date, receive the entire balance due. The Plan also provides that, if Balcor's claim is fixed in excess of $15 million, then its shall be paid in the same fashion, but with interest at a rate of 8.5 percent, which the Debtor contends is the "market rate."

Citicorp's Class 4 claim is fixed at $2.675 million. In the first two years after the effective date, it will receive no payment. In the next three years, it will receive a share of any excess of the net cash flow from the Property paid to Balcor, up to the amount of the regular mortgage payment due to it. On the fifth year, it will also be paid in full.

Continental's Class 5 claim is fixed at $3.75 million and it is to be paid much like Citicorp. It is to receive nothing in the first two years, payments of the Debtor's net cash flow in excess of that paid to

Balcor and Citicorp in the next three years, and is to be paid in full by the fifth anniversary of the effective date. However, the Debtor's principals, who are liable as guarantors on this loan, shall also provide undesignated "additional security" to Continental.

Unsecured creditors are to be paid as convenience claims (at $100) in Class 6 or, in Class 7, from a reserve account of net rents collected post-petition remaining after payment of administrative, priority and convenience claim holders. The Debtor alleges that the reserve account contains over $627,000 and is sufficient to pay such claimants in full. Insiders (Class 8) and partners (Class 9) shall receive no payments, but will retain their interests in the Debtor. Also, the partners agree to keep up the rent of $14,000 monthly on the eighth floor penthouse of the Property if no replacement for a tenant who vacated the Property in December, 1991, is located. All classes except Class 3 voted in favor of the Plan. Balcor rejected the Plan, voting a dollar amount of $17,511,560.00.

The Objections of Balcor to the Plan which Balcor has briefed and therefore presumably presses are as follows:

1. The Plan improperly proposed disbursal of rents, in which Balcor alone has a security interest, to Citicorp, Continental, and the Class 7 creditors;

2. The "negative amortization" aspects of the Plan are not "fair and equitable" as to it; and

3. The retention of their interests in the Debtor by the Debtor's insiders and partners violates the absolute priority rule ("the APR").

The position of the Debtor in the Proceeding requires a recitation of the history of the loan. On December 8, 1986, the Debtor and Balcor signed a Loan Commitment ("the Commitment") whereby Balcor was to provide a loan for $15 million of the $19.6 million purchase price of the Property. This document required that the Debtor provide a $250,000 letter of credit to fund repairs, which was ultimately supplied by the Debtor in the form of a cash escrow. It also required that the Debtor provide a separate $750,000 letter of credit as security for funding operating deficits, tenant improvements, and leasing commissions.

The Commitment expressly provided that Balcor was not obligated, but was merely given the option, to draw upon this second letter of credit for its prescribed uses. The fund loan documents, dated December 11, 1986, a Mortgage Consolidation, Modification, and Restatement of Mortgages ("the Mortgage"); a Consolidation, Modification and Restatement of Secured Promissory Notes ("the Note"); a Pledge and Collateral Agreement ("the Pledge"); and an Assignment of Leases and Rents ("the Assignment"), include no provisions relating specifically to when draws can be made by Balcor on the letters of credit. The Note provides for interest at nine (9%) percent per annum in the first year, 9.35% in the second year, 9.75% in the third year, and 10.35% thereafter. A Schedule providing for increases in interest in the event of default is attached. The loan is to mature about five years later, on January 1, 1992.

Jeffrey Chodorow, Esquire, President and sole shareholder of 641 Corp., the Debtor's sole general partner, provided historical background on the Debtor. The limited partners of the Debtor are AVA Partners, Ltd., and LPA Associates, partnerships in which Chodorow and several associates are partners.

In somewhat rambling fashion, Chodorow related his involvement with over 100 properties "all over the United States." The instant Property was described as an eight-story commercial building consisting of 155,000 square feel originally built as a Simpson Crawford Department Store in the "Ladies Mile Historic District," formerly a prestigious shopping area in the "Midtown South" area of Manhattan. Chodorow reported that the Property was purchased for $19.6 million, financed by the $15 Balcor loan and the loans from Citicorp and Continental totalling about $6 million. The Property, already containing numerous amenities, was further improved, despite the need to maintain its historical facade, by its new owners. Its tenant mix was turned over from a number of tenants pay-

ing below market value to a group of tenants including large firms of allegedly impeccable international reputation. An offer to purchase the Property for $23 million, tendered prior to the economic downturn of 1989, was rejected by the owners.

Bankruptcies, and consequent losses, of several tenants, and an inability to replace these tenants in a slow market, through 1990, had led to the Debtor's financial difficulties. However, the first floor and basement of the Property, a difficult portion for many property owners in its area to rent since the departure of once-thriving retail trade, had been rented to PJF Restaurant, Inc., which occupied the Property in early 1992, began paying rent in 1992, and planned to open a catering and nightclub facility known as the Copacabana ("the Copa") in fall, 1992. This lease was considered a keystone to the Debtor's recovery. Unfortunately, in late 1991, the tenant in the attractive eight-floor penthouse also filed for bankruptcy and vacated the Premises. While confident of re-renting this space, Chodorow expressed the commitment of the partners to pay the going rent of $14,000 monthly until a new tenant was found.

Until 1990, while economic times were good, the Debtor's partners were able and apparently quite willing to make what they considered good investments in funding repairs for, and operating deficits of, the Property with their own funds, without resorting to the repair escrow fund. However, by April, 1990, the economy, and the Debtor's financial picture, was blackening, and the Debtor refused to make the April, 1990, payment of about $180,000 when Balcor refused to reimburse the Debtor for an $112,830 tenant improvement from the escrow fund. Balcor responded to this nonpayment by declaring a default in the loan and attempting to accelerate it. The Debtor apparently also withheld the May, 1990, payment. Finally, in late May, 1990, and June, 1990, the parties resolved this dispute by the Debtor's making up all delinquent mortgage payments and paying part of Balcor's legal fees, and Balcor's agreeing to waive certain default charges and release the $112,830 from the escrow account.

This incident constitutes what the Debtor characterizes, in the Proceeding, as the "First Improper Acceleration" of the loan by Balcor. Recovery of the legal fees and interest paid to Balcor in the settlement, as well as recovery of its own legal fees and expenses, are sought by the Debtor in connection therewith.

In October, 1990, the Debtor remitted only about $57,000 towards its monthly payment. Balcor responded by not only declaring a default, but also accelerating the loan and applying the entire $750,000 letter of credit to the accelerated balance rather than applying it to the delinquency. The Debtor then filed a legal action against Balcor in the Court of Common Pleas of Philadelphia County ("the CCP Court"), Oct. Term, 1990, No. 6547 ("the CCP Case"), to enjoin this action. After a hearing on November 2, 1990, the Honorable Berel Caesar of the CCP Court entered a preliminary injunction in the CCP Case against Balcor, conditioned on the Debtor's posting a $25,000 bond. Judge Caesar found that the letter of credit should have been applied against the delinquency and that a failure to direct Balcor to do so would render the whole balance due and force the Debtor into bankruptcy.

These events constitute what the Debtor designates as the "Second Improper Acceleration." The Debtor seeks recovery of its legal fees expended in filing the CCP Case and the recovery of the $25,000 bond. The Debtor also claims that it is entitled to several million dollars of damages and that Balcor's claim should be subordinated because of this conduct.

The CCP Case was not pursued further. Balcor did adhere to the terms of the injunction by drawing down the letter of credit against future delinquencies of the Debtor, rather than attempting to accelerate the loan. However, the Debtor's financial status was such that, by March, 1991, the mortgage delinquencies had exhausted the letter of credit and the Debtor did file bankruptcy anyway.

The parties dispute whether the Debtor was in default and whether it had received a notice of default at the time of its bankruptcy filing. We were unable to locate any copy of or specific reference to, a notice of default in the record. On April 5, 1991, Balcor filed a Notice of Perfection of a security interest in the Debtor's rent, pursuant to 11 U.S.C. § 546(b).

James Mendelson, a Vice President and the Assistant Secretary of Balcor, who testified in all of the proceedings, quantified Balcor's claim, as of January 22, 1992, at $17,149,206.82 at the contract rate, and at $17,946,706.82, as of March 1, 1991, at the default rate, exclusive of "extraordinary charges such as attorneys' fees." In Balcor's Brief, it is stated that Mendelson testified that there is an additional interest accrual at the rate of $136,000 per month, but we could not locate any reference to this testimony in the record. The Proof of Claim filed by Balcor, as of November 20, 1991, recites its claim as $17,511,560.57, the same figure referenced on its Class 3 ballot, plus interest at $6,907.08 per diem.

Boeckmann testified, at the hearing of November 20, 1991, that, by using a discounted cash flow analysis, he determined the value of the Property to be $15 million as of May 22, 1991. This calculation included the Copa lease. However, Boeckmann did allow that his comparative market data yielded a value figure of $17 to $20 million. Jack Polsenberg, Vice–President of 641 Corp. and apparently the Debtor's chief financial officer, testified that Boeckmann erroneously transposed his $18.50 per square foot fair market rental rate as $17.00 in his later calculations. He further stated that, if this and other mathematical errors were corrected, Boeckmann's value figure would exceed $21 million. Chodorow testified, on the basis of his own experience, that the Property was worth $20 million on November 27, 1991, and that its value had risen to $21 to $22 million as of January 22, 1992, due to an allegedly-improved financial climate in Midtown South.

On January 22, 1992, Polsenberg submitted cash flow data which he contended supported projections that the Debtor's net cash flow, after the effective date of the Plan, would be sufficient to exceed the interest payments due on Balcor's mortgage. However, Chodorow testified that this two-year period of potential negative amortization was necessary to give the Debtor "breathing room." Balcor called Mark Williams, one of its vice-presidents, who is a "non-practicing CPA," to rebut Polsenberg's rosy projections. Williams claimed, on the basis of somewhat dubious factual assumptions, that the Debtor's cash flow was decreasing and would not result in any positive net figure.

## D. DISCUSSION/CONCLUSIONS OF LAW

### 1. THIS COURT MUST DETERMINE ALL MATTERS BEFORE IT.

The Plan confirmation proceeding and the Motion are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(L) and (b)(2)(G), respectively. The Proceeding is alleged to be core under 28 U.S.C. §§ 157(b)(2)(B), (b)(2)(C), (b)(2)(K), and (b)(2)(O). This allegation is admitted by Balcor in its Answer. The Proceeding appears to us to be core under at least 28 U.S.C. §§ 157(b)(2)(C) and (b)(2)(K). Balcor's admission of core status constitutes consent that this court determine this matter, even assuming *arguendo* that it is not core. *See In re St. Mary Hospital,* 117 B.R. 125, 131 (Bkrtcy. E.D.Pa.1990).

We are therefore obliged to determine all aspects of the contested matters and the Proceeding before us.

### 2. THE DEBTOR IS NOT ENTITLED TO ANY RELIEF IN THE PROCEEDING.

The Debtor argues, relative to the Proceeding, that it is entitled to significant monetary damages from Balcor and/or subordination of Balcor's claim as a result of the two aforementioned "improper accelerations" of the Note and Mortgage by Balcor. However, the allegedly "First Improper Acceleration" was settled by June, 1990, and was never raised again as a point of contention, even, apparently, in the CCP

Case. The "Second Improper Acceleration" was apparently remedied by Judge Caesar's Order of November 2, 1990. The CCP action was not pursued further by the Debtor, despite the inapplicability of the automatic stay to this action, because the Debtor was the plaintiff therein. *See Maritime Electric Co. v. United Jersey Bank,* 959 F.2d 1194, 1203–04 (3d Cir.1991), *vacated,* 1992 WL 53790, 1992 U.S.App. LEXIS 348 (3d Cir. Jan. 10, 1992), *reinstated,* 1992 WL 53790, 1992 U.S.App. LEXIS 5144 (3d Cir. March 24, 1992).

■ It is difficult to understand precisely what sort of cause of action is asserted in the Proceeding by the Debtor. In both "acceleration incidents," Balcor was seeking remedies which, if not specifically accorded to it by the Mortgage, Note, and Pledge, were certainly not prohibited by any of them. The language of the Commitment, which specifically authorized the "First Improper Acceleration," was apparently superseded by the loan documents. Nevertheless, a party to a contract is not generally limited to pursuit of the specific remedies enumerated in the contract, but to any remedy afforded to it by law. *See J.L. White Furnace Co. v. C.W. Miller Transfer Co.,* 131 App.Div. 559, 115 N.Y.S. 625, 628 (1909); Annot., *Contractual Provision as to Remedy as Excluding Other Possible Remedies,* 84 A.L.R.2d 322, 324–25 (1962); and 8 AM.JUR.2d 567 (1962).

■ The Debtor argues that the Proceeding is a "continuation" of the CCP Case, at least as to the "Second Improper Acceleration." Further, it contends that we should attach particular significance to Judge Caesar's statement, in his bench Opinion of November 2, 1990, in the CCP Case, that, to permit Balcor to accelerate the loan and reach the entire letter of credit upon the Debtor's default "would result in a fraud.... Intention to commit a fraud, but fraud in fact." Transcript, at 124.

■ However, the Proceeding is *not* a continuation of the CCP Case. It would be so only if the CCP Case had been removed to this court. However, it was not. We note that, since Judge Caesar's decision

was not a "final judgment," but a necessarily swiftly-made decision on a preliminary injunction, no *res judicata* effect attached thereto. *See Pennsylvania Turnpike Comm'n v. McGinnes,* 169 F.Supp. 580, 582–83 (E.D.Pa.1958), *rev'd on other grounds,* 268 F.2d 65 (3d Cir.), *cert. denied,* 361 U.S. 829, 80 S.Ct. 78, 4 L.Ed.2d 71 (1959); *In re Bergman,* 103 B.R. 660, 668 (Bkrtcy.E.D.Pa.1989); and *Creighan v. Pittsburgh,* 389 Pa. 569, 573–74, 132 A.2d 867, 870 (1957). Furthermore, Judge Caesar made no decision at all regarding damages, let alone one that is binding on us. In fact, it might be argued that the Proceeding is, as to the "Second Improper Acceleration," barred by merger. *See In re Laubach,* 77 B.R. 483, 485–88 (Bkrtcy. E.D.Pa.1987).

■ Moreover, we do not read Judge Caesar's decision as a finding that Balcor engaged in illegal, fraudulent acts. Judge Caesar prefaced his comments quoted two paragraphs above with the statement, Transcript, at 124,

> [t]his court wants to make it clear that I make no finding and made no assertion of any conscious intent on the part of the lender to commit a fraud on the borrower.

Therefore, if any "fraud" on the part of Balcor was found, it was at worst some sort of constructive fraud.

We read Judge Caesar's decision as a holding that, although the remedy pursued by Balcor was permissible under the pertinent contracts, it was inequitable under the circumstances and therefore should be enjoined. We might add that we totally concur with Judge Caesar's conclusion on that basis. However, that result does not necessarily entitle the Debtor to damages.

■ Insofar as the Debtor seeks to invoke the doctrine of equitable subrogation against Balcor, pursuant to 11 U.S.C. § 510(c), we note the presence of the following

> tripartite test for when it is appropriate to apply principles of equitable subordination established in *In re Mobile Steel*

*Co.*, 563 F.2d 692, 700 (5th Cir.1977), as follows:

"(i) The claimant must have engaged in some type of inequitable conduct....

(ii) The misconduct must have resulted in injury to the creditors of the bankruptcy or conferred an unfair advantage on the claimant....

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act ..." (citations omitted).

*In re Comtec Industries, Inc.*, 91 B.R. 344, 347 (Bkrtcy.E.D.Pa.1988).

Assuming *arguendo* that inequitable, if not fraudulent, conduct on the part of Balcor is made out, it is difficult to see how the second requirement of injury to the Debtor and conferring of a benefit upon Balcor has been established. In the case of the "First Improper Acceleration," the matter was expeditiously resolved between the parties. The Order of Judge Caesar halted the "Second Improper Acceleration." Furthermore, it is apparent that, despite the receipt of relief in the CCP Case, the Debtor was merely postponing a slide into bankruptcy which concluded with the exhaustion of the entire letter of credit just four months later. We find absolutely no basis to conclude that, had Balcor not acted precipitously, the Debtor could have avoided bankruptcy.

■■■ The fact that the Debtor may have incurred attorneys' fees and was otherwise inconvenienced by contesting Balcor's actions fails to state a cause of action for damages. In light of the applicable "American Rule," even a successful litigant must, in the absence of applicable contractual or statutory fee-shifting provisions, bear its own attorneys' fees. *See, e.g., Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247–71, 95 S.Ct. 1612, 1616–29, 44 L.Ed.2d 141 (1975); and *In re Barrett*, 136 B.R. 387, 394 (Bkrtcy.E.D.Pa.1992). As to the "loss" of the $25,000 security bond, we note that the Debtor has alleged no efforts to recover it from the CCP Court. Presumably, if the Debtor is entitled to recover that bond, the CCP Court would release the bond to it.

For all of the foregoing reasons, judgment must be entered in favor of Balcor in the Proceeding, and that Complaint must be dismissed.

## 3. THE DEBTOR IS ENTITLED TO UTILIZE ITS RENTS TO MAKE DISTRIBUTIONS TO PARTIES OTHER THAN BALCOR IN ITS PLAN.

■■■ Balcor claims that, on the basis of the Assignment, it has an enforceable security interest in the rents which the Debtor has collected from the tenants of the Property, and therefore it is improper for the Debtor to distribute the funds in the reserve account and its future net cash flow from these rents to Citicorp, Continental, and the Debtor's unsecured creditors in the Plan without Balcor's permission to utilize its "cash collateral." We disagree, concluding that Balcor in fact has no security interest in these rent monies under applicable New York state law.

The parties agree that the validity and extent of the security interest of Balcor in the Debtor's rents must be decided under the law of the situs of the Property, *i.e.*, New York. *See, e.g., Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Constable Plaza Associates, L.P.*, 125 B.R. 98, 101 (Bkrtcy. S.D.N.Y.1991); *In re TM Carlton House Partners, Ltd.*, 91 B.R. 349, 352 (Bkrtcy. E.D.Pa.1988).

The law of New York is demanding upon a creditor seeking to assert a perfected security interest in rents.

It is settled law in New York that an assignee of future rents who has done nothing to perfect its rights will not prevail over an execution creditor or a trustee in bankruptcy. *Sullivan v. Rosson*, 223 N.Y. 217, 119 N.E. 405 (1918)....

"The general rule is that the mortgagee is not entitled to the rents and profits of the mortgaged premises until he take s actual possession, or *until possession is taken, in his behalf, by a receiver*.... (emphasis added)."

*Freedman's Savings & Trust Co. v. Shepherd,* 127 U.S. 494, 502, 8 S.Ct. 1250, 1254, 32 L.Ed. 163 (1888).

*Constable Plaza, supra,* 125 B.R. at 101. *See also In re Brose,* 254 F. 664, 666 (2d Cir.1918); *In re Cerrico Realty Corp.,* 127 B.R. 319, 323 (Bkrtcy.E.D.N.Y.1991); *In re Pine Lake Village Apartment Co.,* 17 B.R. 829, 833 (Bkrtcy.S.D.N.Y.1982); *Gomez v. Bobker,* 124 A.D.2d 703, 508 N.Y.S.2d 215, 217 (1986); and *1180 Anderson Ave. Realty Corp. v. Mina Equities Corp.,* 95 A.D.2d 169, 465 N.Y.S.2d 511, 514 (1983). *Cf. In re Wynnewood House Associates,* 121 B.R. 716, 721–23 (Bkrtcy.E.D.Pa.1990); and *Carlton House, supra,* 91 B.R. at 353–55 (applying comparable Pennsylvania law).

The very issue of whether the Debtor was in default under the loan contract, in light of the Order in the CCP Case and Balcor's subsequent draws upon the letter of credit, is at issue. There is no evidence which we have been able to locate in the record which establishes that there was in fact a pre-petition payment default. Therefore, it seems rather clear that no security interest could attach to the Debtor's rents in favor of Balcor.

Secondly, there is no evidence that Balcor provided a pre-petition notice of default, at any time after the CCP Case Order, to either the Debtor or its tenants or any other interested parties, let alone having obtained or even sought the apparently-requisite appointment of a receiver to collect the rents on Balcor's behalf.

█ Balcor attempts to argue that its postpetition filing of a Notice of Perfection of its security interest in the Debtor's rents, by strength of 11 U.S.C. § 546(b), effects a perfection of its alleged security interest in the Debtor's rents. We disagree, for at least two reasons. Firstly, as there is no default proven, there is no evidence that Balcor had a pre-petition right to exercise a security interest in the Debtor's rents. Secondly, there is absolutely no evidence that, under New York law, a security interest in rents is a type of security interest which can "relate back" to an earlier date in the event of a subsequent perfection, as is necessary to trigger § 546(b).

*Cf. Wynnewood House, supra,* 121 B.R. at 726–27; and *Carlton House, supra,* 91 B.R. at 355–57 (applying Pennsylvania law).

Therefore, we conclude that Balcor has not proven that it has a security interest in the rents collected by the Debtor. Consequently, we are unable to conclude that these rents are cash collateral of Balcor. The Debtor may therefore use these rents to fund the claims of creditors other than Balcor under the terms of the Plan without running afoul of applicable bankruptcy or nonbankruptcy law.

**4. THE DEBTOR'S PLAN IS NOT RENDERED NONCONFIRMABLE BY REASON OF THE "ABSOLUTE PRIORITY RULE."**

█ Since Class 3, into which Balcor alone was placed, did not accept the Plan, the Plan does not meet the requirement of 11 U.S.C. § 1129(a)(8). Therefore, the Plan may be confirmed only if it meets the criteria of 11 U.S.C. § 1129(b)(1), which provides as follows:

> (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

The only class which is impaired but has not accept the Plan is Class 3, a class including only a *secured* claim. Therefore, we must consider whether the Plan meets the further criteria of 11 U.S.C. § 1129(b)(2)(A), which provides as follows:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

> (A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

One of the two principal arguments of Balcor is that the Plan in issue violates the APR as described in, *e.g., Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988); *In re Bryson Properties, XVIII*, 961 F.2d 496, 503–04, 22 BCD 1391 (4th Cir.1992); *In re Greystone III Joint Venture*, 948 F.2d 134, 142 (1991), *reconsidered in part on reh'g*, 948 F.2d 134, 22 BCD 1114 (5th Cir.1992); and *In re 222 Liberty Associates*, 108 B.R. 971, 983 (Bkrtcy.E.D.Pa. 1990), in that it allows the Debtor's interest holders to retain those interests even though a class which is senior to those interests will not be paid in full.

The APR, as articulated by Balcor, is set forth in the Bankruptcy Code at 11 U.S.C. § 1129(b)(2)(B)(ii), as follows:

(b) With respect to a class of unsecured claims ...

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such claim or interest any property.

It will be noted that this section refers only to the consequences of the failure of a class of *unsecured* creditors to accept a plan. Since Balcor's claim is placed in a class of a secured creditor, 11 U.S.C. § 1129(b)(2)(B)(ii) does not apply. *See In re Nelson*, 133 B.R. 786, 791–92 n. 10 (Bkrtcy. S.D.Miss.1991); *In re Orfa Corp. of Philadelphia*, 22 B.C.D. 427, 430, 1991 WL 225985 (Bkrtcy.E.D.Pa.1991) (*"Orfa II"*); and 5 COLLIER ON BANKRUPTCY, ¶ 1129.03[4][3], at 1129–77 to 1129–80 (15th ed. 1991).

 Balcor attempts to argue around this conclusion by contending that it is a member of Class 7 established in the Plan, *i.e.,* general unsecured creditors, in light of its having a deficiency claim, as well as being a member of Class 3. It is true that the Plan describes Class 3 as the "Allowed Claim of Balcor ... to the extent such Claim is a Secured claim as defined in section 506(a) of the Bankruptcy Code, ..." However, the Proof of Claim filed by Balcor designates its *total* claim as secured. The Debtor has *not* sought to bifurcate the claim of Balcor into secured and unsecured portions, pursuant to 11 U.S.C. § 506(a). Rather, the Debtor has consistently argued that the value of the Property is at least $20 million, an amount at least $2 million in excess of any claim made by Balcor. It therefore contends that Balcor's claim is oversecured, not undersecured and subject to § 506(a).

The only challenge to the amount of Balcor's Claim levelled by the Debtor was via the Proceeding, which we ruled, at pages 625–627 *supra*, must be dismissed in its entirety. The Claim of Balcor is therefore deemed allowed as filed, 11 U.S.C. § 502(a), *i.e.,* as a totally secured claim. In its Report of Plan Voting, which has not been challenged by Balcor, the Debtor, quite properly, excluded Balcor's vote as a Class 7 creditor. Class 7, as well as the other classes of unsecured claims, has therefore accepted the Plan. The APR, as articulated in 11 U.S.C. § 1129(b)(2)(B)(ii), is hence inapplicable.

Consequently, we need not reach Balcor's alternative argument that the Debtor

has failed to establish the elements of the "new value exception" to the APR. *See Orfa II, supra,* 22 B.C.D. at 430–31; and *222 Liberty, supra,* 108 B.R. at 983–85. We simply conclude that confirmation of the Plan cannot be denied by reason of the APR because that rule is not in issue.[1]

### 5. IN CERTAIN RESPECTS, THE DEBTOR'S TREATMENT OF BALCOR IS NOT "FAIR AND EQUITABLE."

Balcor argues, finally, that the Plan cannot be confirmed because its "negative amortization" aspects render its treatment under the Plan as something less than "fair and equitable" to its interests. Therefore, while not claiming that the specific requirements of § 1129(b)(2)(A)(i) are not met by the Plan, Balcor contends that the general requirements of § 1129(b)(1) is not met as to it.

It is indisputable that the Plan contains provisions which raise a potential for a certain degree of negative amortization of the interest payments due on Balcor's claim. Specifically, the Plan provides that, in the first two years after the effective date, Balcor is obliged to accept the *lesser* of its regular interest payment *or the Debtor's net cash flow.* While Polsenberg testified that the Debtor's net cash flow was likely to exceed the interest payments, rendering the issue moot, the testimony of Williams was directly to the contrary. Although Williams' testimony was less than totally convincing, it is clear to us that, if the Debtor were completely confident about its positive cash flow prospects, as projected by Polsenberg, it would have simply proposed payments to Balcor at the designated interest rates and avoided any issue of negative amortization.

There appears to be little question that negative amortization is not *per se* objectionable. *See Great Western Bank v. Sierra Woods Group,* 953 F.2d 1174, 1177 (9th Cir.1992) (only decision holding that negative amortization is impermissible *per se, In re McCombs Properties VIII, Ltd.,* 91 B.R. 907, 911 (Bkrtcy.C.D.Cal.1988), *see* D. Pollard & G. Brooks, *Deferring Interest & Reducing Plan Payments Through Negative Amortization,* 3 FAULKNER & GRAY'S BANKR.L.REV. 5, 6 (No. 3, 1991) (cited as "Pollard"), is expressly disapproved by the Court of Appeals in its own Circuit); *Orfa II, supra,* 22 B.C.D. at 429; *In re Orfa Corp. of Philadelphia,* 129 B.R. 404, 417–21 (Bkrtcy.E.D.Pa.1991) ("*Orfa I*"); and *222 Liberty, supra,* 108 B.R. at 995 & n. 17.

However, courts have been wary of plans which contemplate negative amortization and have actually permitted its use in rather few instances. *See* Pollard, *supra,* at 7–11. Notable exceptions are *Orfa II, supra;* and *In re Club Associates,* 107 B.R. 385, 398–400 (Bkrtcy.N.D.Ga.1989).

■ The trend of decisions analyzing plans contemplating negative amortization appears to be to test a plan as against an ever-increasing list of factors which are relevant to the determination of whether the use of negative amortization is appropriate. The most comprehensive list produced to date is the following, set forth in *Great Western, supra,* 953 F.2d at 1178, quoting *In re Apple Tree Partners, L.P.,* 131 B.R. 380, 398 (Bkrtcy.W.D.Tenn.1991):

1. Does the plan offer a market rate of interest and present value of the deferred payments;

2. Is the amount and length of the proposed deferral reasonable;

3. Is the ratio of debt to value satisfactory throughout the plan;

---

**1.** We also note that Balcor, as a secured creditor, appears to lack standing to raise the APR as a basis for objection to the plan, since the APR affects only the interests of unsecured creditors. *See, e.g., In re B. Cohen & Sons Caterers, Inc.,* 124 B.R. 642, 647 (E.D.Pa.1991); and *In re Orlando Investors, L.P.,* 103 B.R. 593, 596–97 (Bkrtcy.E.D.Pa.1989). Since the issue of the applicability of the APR never arises statutorily,

we also may not exercise our general power to independently satisfy ourselves that the Plan would be confirmable if a class of unsecured creditors had rejected it. *Compare In re Richard Buick, Inc.,* 126 B.R. 840, 846 (Bkrtcy. E.D.Pa.1991) (court has an independent obligation to satisfy itself that criteria of a plan for confirmation is satisfied).

4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;

5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

6. Are the risks unduly shifted to the creditor;

7. Are the risks borne by one secured creditor or class of secured creditors;

8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and

10. Are there adequate safeguards to protect the secured creditor against plan failure.

*Compare Orfa I, supra,* 129 B.R. at 418–19; and B. Shermer & K. Bartz, *Negative Amortization & Plan Confirmation: Is It Fair & Equitable Under Section 1129(b) of the Bankruptcy Code?,* 8 BANKR. DEV.L.J. 1, 8–9 (1991).

■ We believe that considering this list of factors is appropriate, with the observation, made by the *Great Western* court, 953 F.2d at 1178, that these factors should not be considered alone and may have different weights in different contexts. The main addition to the *Great Western/Apple Tree* list from that applied by us in *Orfa I* is the consideration of the remedies available to the secured creditor in the event that developments projected by the plan do not materialize. While the *Great Western* list is perhaps repetitive in emphasizing this issue (factors 6, 8, and 10 all appear variations of this same concern), the significance of this factor cannot be minimized. If the Plan allows a secured creditor to obtain swift redress in the event of dismal performance by a debtor, as opposed to locking in a secured creditor without adequate returns on its security or redress in the event of default for an extended period, a court should properly feel more comfortable about allowing a negative amortization feature in a plan.

■ The first factor, and the one to which Balcor, we think properly, devotes the most attention, is the rate of interest provided in the Plan. The most unusual aspect of the Plan is the inclusion of provisions that propose to pay Balcor interest on its Claim at a rate of 10.18 percent, allegedly the "contract rate," if Balcor's claim is fixed at $15 million, but only a rate of 8.5 percent, allegedly a "market rate" of interest, if Balcor's claim is fixed at more than $15 million.

These provisions raise several perplexing questions. One issue, which arose at the trial of the Proceeding and is now thankfully moot, is what rate would apply if Balcor's claim were fixed at *less* than $15 million. On its literal terms, the Plan does not seem to address this possibility, even though the prospect of Balcor's claim being less than $15 million is what the Debtor argued, in light of the Proceeding, should transpire. It also seems very strange to pay almost two percent more interest on a claim just because it is larger than a certain fixed amount. A bizarre consequence would be that a claim of $15,000,001 would be "worth" far less than a claim of $15 million.

The only sense which we can make of these provisions is that they are archaic residue from the parties' ultimately-unconsummated settlement negotiations. The settlement apparently proposed the Debtor's paying Balcor at a fixed rate (contract rate) on a fixed claim (of $15 million). The alternative was the Debtor's threat, in the absence of an agreement, to attempt to have the interest rate (and ultimately the amount of the claim) set at a lower rate.

We know that the prime rate of interest has fallen to the range of six (6%) percent, placing the alternative rate suggested here within the range of two (2%) percent above prime established as reasonable in *Orfa I,* 129 B.R. at 420–21. However, the market rate was established in *Orfa I* on a complete record which included significant expert testimony on the appropriate "market rate" of interest for that specific "forced loan." *Id.* at 420. A loan commitment had been obtained by the *Orfa* debtor at the very rate fixed there by the court. *Id.* The instant record, by way of contrast, is devoid of any evidence of the proper market rate of interest, except for some gener-

alizations recited by Chodorow, which we do not count for very much. It also cannot be forgotten that, at the time of the *Orfa* hearings, the prime rate was ten (10%) percent, *id.*, and the resulting rate of interest would have been twelve (12%) percent, a rate which itself many other courts had found reasonable. *Id.* at 420–21. It seems inequitable to allow the Debtor to obtain negative amortization and a fixed rate mortgage calculated on the present prime rate at a time when that rate is very low. Moreover, as *Orfa II* indicates, 22 B.C.D. at 429, the debtor in that case reduced the degree of negative amortization in the plan proposed in response to *Orfa I* and introduced a new funding source into the plan which was ultimately confirmed.

We conclude that the variant interest rates in the current Plan are anomalous and must be revised. We would strongly recommend that, if the Debtor retains the negative amortization feature, it provide Balcor with the contract rate of interest if it wishes to achieve confirmation of an amended plan. An equally-viable alternative would be to delete the negative amortization feature from the Plan.

█ Turning to the other *Great Western/Apple Tree* criteria, we find that the amount and length of the amortization sought (two years, contingent upon the net cash generated by the Debtor) is modest and acceptable under the terms proposed in the foregoing paragraph.

The ratio of the debt to value cannot be ascertained, as no party has asked us to value the Property. There is some evidence of a modest equity cushion, even assuming that Balcor's claim is allowed in full. This factor is not significantly in the Debtor's favor, but is relatively good in the context of the present prospect of the totally undersecured status of secured lenders of many contemporary real estate partnership-debtors. The instant Debtor owns an attractive building in a location which is apt to change economically for the better. This factor should not preclude the degree of negative amortization sought.

The Debtor's projections, while not unassailable, appear sound. While projecting

no need to resort to the negative amortization feature, the Debtor nevertheless requests the presence of this feature. This appears to be a prudent approach, and this factor is satisfied.

We find that the Property which is the loan collateral *is* likely to appreciate in value. Obviously the prospects are not as great as the upward range of the possibilities in *Orfa, see Orfa II, supra,* 22 B.C.D. at 428; and *Orfa I, supra,* 129 B.R. at 411, but they are good. Certainly, the prospects are sufficiently attractive that we would not hold that a negative amortization feature is totally unacceptable in the context of this Plan.

The first "shift of risk" factor, Number 6 in the proffered list, as indicated at page 631 *supra,* implicates the mechanisms of the creditor to check the debtor's failure to achieve its projections. The second "risk factor," Number 7 on the list, relates to the burden placed upon the objecting creditor relative to other creditors.

The Plan contemplates a greater degree of negative amortization to the Debtor's other large creditors, Citicorp and Continental, than it does to Balcor. These creditors are entitled to payments out of net cash flow only *after* distributions to Balcor. *See* page 622 *supra.* We therefore cannot say that the risks borne by Balcor are any greater than those put upon the Debtor's other major creditors.

The crucial sixth, eighth, and tenth factors appear to be adequately provided. It is only in the first two years that Balcor could receive virtually no payments and yet be precluded from proceeding against the Debtor. If the Debtor fails to make interest payments in the third year and/or fails to refinance or sell the Property to satisfy Balcor's claim after the fifth year, Balcor will have recourse under 11 U.S.C. §§ 1142, 1112(b). Given the positive aspects of the value-to-debt ratio, feasibility, and likelihood of the collateral to appreciate, we cannot say that the contemplated contingent, two-year deferral of Balcor's rights is unreasonable.

Finally, we note that the parties' original loan contained modest negative amortization features. *See* page 623 *supra*. The degree of negative amortization sought here is, however, clearly more substantial than in the loan. This factor is therefore neutral.

No other factors, except the anomalies in Balcor's current treatment under Class 3 in the Plan, present themselves to this court in the cause of its independent review of the Plan. *See Richard Buick, supra*, 126 B.R. at 846. We therefore conclude that, while the current plan is not "fair and equitable" in its treatment of Balcor's claim because of the absence of one of the factors required to allow negative amortization, an amended plan containing the alternative revisions suggested herein, *see* page 632 *supra*, could readily be proposed.

6. SINCE THE DEBTOR APPEARS CAPABLE OF PRODUCING A CONFIRMABLE PLAN, RELIEF TO BALCOR FROM THE AUTOMATIC STAY SHALL BE CONDITIONED ON THE DEBTOR'S DOING SO.

In *Orfa I, supra*, 129 B.R. at 425–27, we outlined our inclination to allow the debtor to amend a plan which had certain discrete and obviously correctable defects, conditioning the extension of the automatic stay, as to the objecting secured creditor, on the debtor's production of an amended plan curing the perceived deficiencies. *See also Richard Buick, supra*, 126 B.R. at 855. *Compare 222 Liberty, supra*, 108 B.R. at 997–98 (debtor precluded from filing an amended plan in light of seven previous unsuccessful efforts and the presence of a creditor's competing plan).

We also pointed out, in *Orfa I*, the perils of that process, and the great advantages to all parties in returning to the bargaining table instead of the courtroom upon receipt of such a confirmation Opinion. *Id.* at 425–26. The *Orfa* parties either did not or could not heed our advice. We confirmed an amended plan in *Orfa II*. A floodgate of appeals and post-confirmation motions,

which have not yet run their course, ensued. If future performance is an issue, as it usually is, better that the parties pick some reasonable guideposts and allow the Debtor to go about its business or voluntarily be put to rest depending on whether these guideposts are met. Hopefully, the instant parties will prove wiser than those still embroiled in *Orfa*.

E. CONCLUSION

An Order consistent with this Opinion will be entered.

ORDER

AND NOW, this 13th day of May, 1992, upon consideration of a record made at hearings on November 20, 1991, November 27, 1991, and January 22, 1992, to determine the Motion of BALCOR REAL ESTATE FINANCE, INC. ("Balcor") for relief from the automatic stay ("the Motion") and whether this court should confirm the Amended Plan of Reorganization proposed by 641 ASSOCIATES, LTD. ("the Debtor"), and the trial of April 9, 1992, of the above-captioned adversary proceeding, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of Balcor and against the Debtor in Adversary No. 92–0036S. The Complaint in the Proceeding is therefore DISMISSED.

2. Confirmation of the Amended Plan of Reorganization submitted by the Proponents is DENIED.

3. Continued denial of relief to Balcor pursuant to the Motion is conditioned upon the filing of a Second Amended Plan and an accompanying Amended Disclosure Statement by the Debtor or any other interested party, in conformity with the accompanying Opinion, serving black-lined copies of same upon counsel appearing on the attached Mailing List, and notifying all interested parties of the filing of the Amended Disclosure Statement, on or before May 26, 1992.

4. A hearing on the further Amended Disclosure Statement and to determine

whether the Motion should be granted at that time.